COMMONWEALTH vs. RAYMOND P. VINNIE.

Norfolk. April 7, 1998. - August 12, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Bill of particulars, Assistance of counsel, Instructions to
jury. *Evidence,* Alibi, Voluntariness of statement, State of mind, Cumula-
tive evidence. *Grand Jury.*

There was no merit to a criminal defendant's claim that the Commonwealth's
bill of particulars with respect to the time of the murder and the reciprocal
discovery with respect to the defendant's alibi defense was prejudicial or
denied him his constitutional rights to present a defense and to a fair trial.
[165-167]
Any action of an investigating officer with respect to the defendant's alleged
alibi witnesses, or defense counsel's tactical decision not to call them to
testify, was harmless beyond a reasonable doubt, where the witnesses'
testimony was unimportant relative to the evidence the jury had heard and
could not have affected the verdict. [167-168]
At a murder trial in which the defendant had implied that other persons were
involved in the killing but in which insufficient evidence was introduced to
support an instruction on joint venture, the judge's instruction, in response
to a question, that the jury would have to find that the defendant had killed
the victim to return a verdict of guilty was correct, and his further remark
to the effect that the involvement of others was not precluded was not er-
ror. [168-169]
In a murder case, the judge correctly ruled that, during a series of interviews
with police in which the defendant was not in custody, the defendant's
statements were voluntary and no Miranda warnings were required.
[169-171]
At a murder trial, defense counsel's decision not to challenge the admissibility
of certain statements the defendant made to police was not manifestly
unreasonable. [171-172]
At a murder trial, erroneously admitted evidence of the victim's state of mind
was merely cumulative of other significant evidence that the victim had
expressed hostility directly to the defendant, which was relevant to motive
[172]; and certain other hearsay testimony erroneously admitted was
likewise cumulative of properly admitted evidence and was not prejudicial
[172-173].
A judge of the Superior Court did not err in refusing to dismiss a murder
indictment based on the defendant's allegation that unauthorized persons
were allegedly present during grand jury proceedings [173]; nor did the
judge err in ruling that the integrity of the grand jury was not impaired by
inaccuracies in testimony before them [173-174].

In a murder case, the Commonwealth improperly elicited, before the grand jury, evidence of the defendant's prior misconduct, however, in view of the powerful evidence against the defendant, the improper evidence was not demonstrated to have made a difference in the jury's decision to indict. [174-175]

At a murder trial, the Commonwealth's late disclosure of certain marginally exculpatory evidence that came to light only during the trial did not harm the defendant, where defense counsel was able to make effective use of the evidence in presenting the defendant's case. [175]

Any error of defense counsel at a murder trial in not moving to suppress certain physical evidence did not create a substantial likelihood of a miscarriage of justice, where the evidence was only cumulative of other properly admitted testimony. [176-177]

In a criminal case, the district attorney had reasonable grounds to believe that the defendant may have used his telephone for the unlawful purpose of establishing a false alibi and his request for telephone records pursuant to an administrative subpoena in compliance with G. L. c. 271, § 17B, was proper; failure of defense counsel to have moved for suppression of the records did not constitute ineffective assistance of counsel. [177-178]

This court held that a defendant may move to suppress telephone records acquired by administrative subpoena, and the motion should be allowed if it is shown that the district attorney had no reasonable grounds to believe that the telephone was being used for an unlawful purpose. [178]

This court stated that G. L. c. 265, § 1, established the right of a defendant charged with murder in the first degree to a jury's determination of the degree of murder: the court also announced that, prospectively, the jury's determination of the degree of murder is not subject to a defendant's waiver. [179-181]

In a murder case in which the evidence did not warrant an instruction on murder in the second degree and in which both the defendant and the Commonwealth acquiesced in the erroneous omission of the instruction, the defendant did not demonstrate any prejudice, and reversal of the verdict was not required. [180]

INDICTMENT found and returned in the Superior Court Department on July 7, 1993.

The case was tried before *Paul A. Chernoff*, J., and a motion for new trial was heard by him.

*Daniel J. Johnedis* for the defendant.

*Stephanie Martin Glennon*, Special Assistant District Attorney, for the Commonwealth.

*Raymond P. Vinnie*, pro se, submitted a brief.

MARSHALL, J. The defendant, Raymond P. Vinnie, was convicted of murder in the first degree. The jury had received instructions on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal, he claims a series of errors by

the Commonwealth, the trial judge, and his trial counsel. We affirm the conviction and the judge's ruling on Vinnie's postconviction motion, and we decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict.

We review those claimed errors that were preserved before or during trial, and those that were resurrected by the judge in postconviction rulings on Vinnie's motion for a new trial[1] according to standards more favorable to the defendant than errors claimed on appeal that were not preserved or resurrected. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 552-555 (1998). Constitutional errors that were preserved or resurrected are reviewed to determine whether or not they were harmless beyond a reasonable doubt, unless the constitutional right infringed is "so basic to a fair trial that [its] infraction can never be treated as harmless error." *Chapman* v. *California*, 386 U.S. 18, 23 (1967). See *Yates* v. *Evatt*, 500 U.S. 391, 402-405 (1991); *Commonwealth* v. *Garcia*, 379 Mass. 422, 441-442 (1980).[2] Nonconstitutional errors, preserved or resurrected below, are reviewed according to a nonprejudicial error standard. An error is nonprejudicial only "[i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). We review the other claimed errors, raised only on appeal, to see if they created a substantial likeli-

---

[1]Vinnie filed a motion to dismiss or, in the alternative, for a new trial in this court. We remanded the motion for hearing in the trial court. The motion was denied by a judge in the Superior Court who was also the trial judge. He conducted an evidentiary hearing on the motion and issued careful and comprehensive findings of fact and rulings.

[2]Ineffective assistance of counsel claims, although of constitutional dimension, raise claims of trial errors that, of course, were not preserved by an allegedly incompetent trial counsel. Generally, we review such errors as to whether there is a substantial likelihood of a miscarriage of justice because our statutory standard of G. L. c. 278, § 33E, is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). A judge may resurrect claimed errors due to the ineffective assistance of counsel by addressing them in ruling on a postverdict motion, in which case the appropriate harmless or nonprejudicial error standard applies.

hood of a miscarriage of justice.[3] *Commonwealth* v. *Carter*, 423 Mass. 506, 514 (1996).

1. *Facts.* We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. *Commonwealth* v. *Reed*, 427 Mass. 100, 101 (1998). On the morning of April 12, 1990, Adlene Hardison found the body of her sixteen year old son, Charles, in the basement of her Milton home. He had died as a result of several gunshot wounds to the head and chest. At the time of the murder, Vinnie resided with Charles, Charles's mother, and her elderly grandmother. Vinnie and Charles's mother were engaged in 1986 and took up residence together in Milton. During the fall of 1989, however, their relationship deteriorated, punctuated by frequent arguments and marred by incidents of physical abuse of Charles's mother. In December, 1989, or January, 1990, Charles's mother asked Vinnie to move by March 1, 1990.

Charles repeatedly expressed his wish to Vinnie; to his mother; to his father, Larry Hardison; and to others, that Vinnie leave the house. On the morning of January 28, 1990, Charles found his mother crying in response to Vinnie's yelling and smashing a glass on the floor, and Charles said to Vinnie, "Nobody asked you to move back here." Shortly thereafter, Vinnie shoved Charles against a wall. In March and again in early April, Charles asked his mother when Vinnie, who had not moved out yet, would be doing so.

Charles last was seen alive at 7 P.M. on April 11, 1990, by his father, who had stopped by the Milton residence to drop off strings for Charles to restring a tennis racket. Charles's mother returned home from an evening class at approximately 10 P.M., went to the kitchen, saw the tennis strings and racket, and closed

---

[3]In this case, most of the claimed errors were preserved or resurrected and qualify, if we conclude that an error was committed, for review under the standard of harmless beyond a reasonable doubt or the nonprejudicial error standard. Vinnie's only claimed errors that would not qualify for one of these more favorable standards, because they were not preserved or resurrected, are his claims of ineffective assistance of counsel for not moving to suppress Vinnie's statements in several interviews with the police, see Part 4, *infra*, and for not moving to suppress certain physical evidence and telephone records, see Part 7, *infra*. We note that trial counsel objected without success to the introduction of telephone records on grounds other than those raised on appeal here; consequently, that objection did not preserve the issue on appeal for review under the nonprejudicial error standard.

the basement door after noticing it ajar. Early the next·morning, she discovered Charles's body in the basement. Vinnie had left the house shortly before Charles's mother discovered the body.

Police officers investigating the murder scene saw white powder together with a torn paper envelope and a ripped package. Two days later, Charles's mother discovered under Charles's bed rubber gloves and twenty-eight glassine packets, stapled closed, containing white powder. The white powder in the basement and under the bed proved to be baking soda. A special agent of the United States Drug Enforcement Administration testified that the circumstances were "completely inconsistent with an actual drug transaction or a facsimile drug transaction."

Tracy West, a long-time acquaintance of Vinnie, testified that in early 1990, Vinnie said he was having problems with Charles and wanted to teach Charles a lesson by having someone wound him. West recruited Derrick Sealy to make threatening telephone calls to the victim's house and to shoot and wound the victim. Sealy, after taking $1,000 and a gun from West, provided by Vinnie, did not follow through with the plan to wound Charles. On the afternoon of April 11, 1990, West visited Vinnie at his print shop, where he watched and then assisted Vinnie in filling glassine bags with baking soda. Vinnie told West that he had a "mission," and that he intended to kill Charles. Significant additional evidence implicated Vinnie in Charles's murder.

2. *The alibi defense.* Vinnie argues that several errors combined to deprive him of the opportunity to present evidence of an alibi. Critical to his alibi is the time that Charles was shot. On the evening of the murder, Charles spoke with several high school friends on the telephone. At the end of his conversation with Antoinette Barrow at some time between 8:30 P.M. and 8:50 P.M., Charles said that he thought he heard his mother coming in[4] and that he would call Antoinette back shortly. He did not call back. A neighbor testified that she saw Vinnie's car at the Hardison home when she went out at 8 P.M. or 8:15 P.M., and Vinnie's car was no longer there when she returned within ten to fifteen minutes.

Vinnie maintained that he was at his print shop in Brockton on the evening of the murder until closing at 9:15 P.M. or 9:30 P.M. He then went to the home of.a friend, Hal Pompei, arriving

---

[4]Charles's mother, in fact, did not arrive home until later that night.

at about 10 P.M., leaving at about 11 P.M., and returning to the Hardison home. In an interview with State Trooper Joseph Flaherty,[5] Vinnie claimed that he had a twenty-minute to thirty-minute telephone call with Pompei between 7:30 P.M. and 8:30 P.M. Telephone records showed that the call had been made to Pompei at 6:09 P.M., and lasted nine minutes. Several witnesses testified at the grand jury that they had seen "a black gentleman," presumably Vinnie, locking up the print shop at about 9:30 P.M. Vinnie's trial counsel did not call these individuals in his case-in-chief, but he did bring out this information in cross-examining Flaherty. Flaherty also testified that, having traveled the route from the print shop to the Hardison home, the driving time was approximately twenty-six minutes.

First, Vinnie claims that the Commonwealth's refusal to narrow the time frame that the murder occurred in its indictment or bill of particulars,[6] coupled with its motion for a notice of alibi pursuant to Mass. R. Crim. P. 14 (b) (1) (A), 378 Mass. 874 (1979), was designed to compel the defendant to disclose the place he claimed to have been at the time of the offense without committing the Commonwealth to any specific time period. This alleged prosecution strategy, Vinnie argues, tilted the constitutional balance struck by the reciprocal discovery provisions of rule 14 (b) (1) in favor of the Commonwealth, and violated the defendant's right to due process. Vinnie ignores in this argument that, from the inception of the police investigation, Vinnie was on record as claiming to be at the print shop

---

[5]Trooper Flaherty was assigned to the district attorney's office in this case and was the lead investigator.

[6]The indictment alleged that the murder occurred "on or about April 11, 1990." The Commonwealth repeated that time frame in a bill of particulars, but also provided Vinnie a death certificate which fixed the time of death at about 8 P.M. Subsequently, Vinnie received discovery materials, including grand jury minutes and police reports detailing evidence anticipated to support the Commonwealth's theory that the victim was murdered between 8:30 and 9 P.M. At a pretrial hearing on Vinnie's motion to order the Commonwealth to complete its answer to the defendant's bill of particulars, Vinnie pressed the issue for the purpose of reading the bill of particulars to the jury. The judge reserved his ruling "until the evidence concerning time, place, manner and means is elicited in the case in chief." At the hearing, the judge explained, "If you're going to have exhaustive testimony from witnesses as to . . . the approximate time of whatever happened . . . and a Commonwealth's response to a bill [of] particulars would be simply a means for trying to abstract from that an approximate time, what's the evidentiary value of it?" After completion of the prosecution's case-in-chief, Vinnie did not revisit the issue.

during the evening hours of April 11, 1990, until 9:30 P.M.[7] In light of that information, we cannot discern how the Commonwealth, even if it had engaged in the claimed procedural maneuver, could have gained new information concerning Vinnie's whereabouts for purposes of an alibi.

Noting that the effect of particulars is to "bind and restrict the Commonwealth as to the scope of the indictment and the proof to be offered," *Commonwealth* v. *Hare*, 361 Mass. 263, 270 (1972), Vinnie further argues that he was entitled to the Commonwealth's specification of the time of the murder and the benefit of the binding effect that such specification would have had at trial. We have cautioned, however, that judges should not order "particulars which, in their requirement for detail or otherwise, amount to the imposition of a straitjacket on the prosecution." *Commonwealth* v. *Baker*, 368 Mass. 58, 77 (1975). We do not endorse a defendant's right to specification of a time frame that is narrower than the totality of the Commonwealth's relevant evidence, notwithstanding any minor inconsistencies, may warrant. Here, the Commonwealth could have narrowed the time frame to the evening hours beginning around 8 P.M. on the fatal day. Even if, however, the Commonwealth erred in not stating such a narrower time frame, we fail to see how any such failure, in light of Vinnie's full access through discovery to the Commonwealth's evidence, was prejudicial or denied him his constitutional rights to present a defense and to a fair trial. Any error was harmless beyond a reasonable doubt.

"A bill of particulars should give a defendant reasonable notice of the nature and character of the crimes charged." *Commonwealth* v. *Amirault*, 404 Mass. 221, 233 (1989), citing *Commonwealth* v. *Hayes*, 311 Mass. 21, 24-25 (1942). "The defendant had reasonable knowledge of the crimes charged, with adequate notice to prepare his defense." *Amirault, supra* at 233-234. "The defendant here was not surprised by the proof offered by the Commonwealth at trial." *Id.* at 234.

Vinnie raises two further issues concerning his opportunity to present alibi evidence. Vinnie contends that his alibi defense was sabotaged by Trooper Flaherty's interference with witnesses who were available on the last day of trial to testify to

_____

[7]The initial police interview with Vinnie, conducted after complete Miranda warnings, included Vinnie's account of his whereabouts on the day and evening of April 11, 1990.

seeing Vinnie at his print shop at about 9:30 P.M. on the night of the murder.[8] Vinnie raised this issue in a motion for a new trial, as well. The judge determined that Vinnie's trial counsel did speak with the witnesses and elected not to call them. Vinnie also argued that his trial counsel was ineffective in not interviewing the alibi witnesses before trial. Flaherty's intervention in the courthouse interviews may have been heavy handed, and trial counsel's belated effort to interview the witnesses in the courthouse corridor on the last day of a lengthy trial may not be an example of professional excellence. But, even if we were to view Flaherty's action as improper and trial counsel's conduct negligent, the testimony of these witnesses was "unimportant in relation to everything else the jury considered," and their testimony could not have affected the verdict. *Yates* v. *Evatt*, 500 U.S. 391, 403 (1991). The apparent sighting of Vinnie at 9:30 P.M. by these witnesses had been elicited already by trial counsel in cross-examination of Flaherty. Having that fact, the jury nonetheless found Vinnie guilty beyond a reasonable doubt; they could have reasoned that Vinnie would have been able, after Charles's last telephone call was interrupted, quickly to ambush and execute Charles before 9 P.M. with sufficient time to arrive in Brockton by 9:30 P.M. Any error attributed to Flaherty or Vinnie's defense counsel was harmless beyond a reasonable doubt.

3. *Jury instruction.* Vinnie next claims an error in the jury instructions. The judge charged that one of the elements of murder in the first degree was that "the defendant caused or did an unlawful killing." Shortly after beginning deliberations, the jury asked, "Must we find that [the defendant] fired the gun that killed Charles or is it sufficient that he caused the killing? If the latter, must he have been present at the killing?" To this question, the judge responded, "You would have to find on the basis of all the credible evidence and the reasonable inferences to be drawn therefrom that the defendant was present and killed the deceased. This does not preclude the involvement or non-

_____
[8]The Commonwealth agreed to assist the defense by securing the availability of the alibi witnesses. Trooper Flaherty called the witnesses to secure their presence. While Vinnie's defense counsel was interviewing one of the witnesses in the courthouse corridor, Flaherty intervened to say that the witness could, but did not have to, talk to Vinnie's defense counsel. Flaherty repeated this to another alibi witness.

involvement of any other person or persons."[9] Vinnie argues
that these instructions were vague and ambiguous, at best, and,
at worst, misled the jury and allowed them to convict Vinnie of
the murder without having found that he actually did the shoot-
ing.

The judge was not required to respond to the jury's request
with an instruction on the specific way that Charles's death was
caused or the instrument or means used — questions that the
jury were required to decide for themselves, even in cases such
as this where the cause and manner of Charles's death were not
disputed. Nor, in repeating[10] that the jury must find that the
defendant killed the victim, did the judge render an element of
the crime of murder vague or ambiguous. That the judge com-
mented that the involvement (or noninvolvement) of other
persons was not precluded was an appropriate acknowledgment
that Vinnie had raised implications of the involvement of oth-
ers, without sufficient evidence having been introduced to sup-
port an instruction on joint venture. There was no error.

4. *The defendant's interviews with the police.* Next, Vinnie
argues that his statements to police in a series of interviews
throughout the investigation[11] should have been suppressed
based on alleged violations of his rights. *Miranda* v. *Arizona*,
384 U.S. 436, 467-473 (1966). Vinnie argues that the judge
erred in admitting statements from the interviews on May 30,

---

[9]Because Vinnie, in cross-examining West and Sealy, implied that one or
both went to the Hardison home that night and actually shot Charles, the
prosecutor asked for a jury instruction on joint venture. The judge observed
that there was no evidence that anyone besides Vinnie and Charles were
present at the Hardison home around the time of the murder. The judge,
therefore, declined to give "a straight joint venture instruction."

[10]The judge's instructions stated numerous times that the jury had to find
that Vinnie committed an unlawful killing.

[11]Vinnie was first interviewed on the morning of April 12, 1990, at the Mil-
ton police station, at which time he was read Miranda rights; he does not seek
suppression of that interview. Subsequently, six interviews were conducted at
Vinnie's print shop between April 12, 1990, and May 30, 1990. Trooper Fla-
herty also elicited information after meeting Vinnie at the Hardison residence
on May 23, 1990, while Vinnie removed his belongings. Vinnie was
interviewed at his residence in Georgia on November 2, 1991. On June 12,
1993, Flaherty invited Vinnie to make a statement at the grand jury proceed-
ings, but elicited no information. From the second interview on April 12,
1990, until Vinnie was arrested on July 7, 1993, Vinnie was given no Miranda
rights. Vinnie's defense counsel at trial specifically objected to admissibility
of statements on May 30, 1990, and November 2, 1991.

1990, and November 2, 1991.[12] For the first time on appeal, he further argues that statements from the second interview on April 12, 1990, and all subsequent interviews through the May 23, 1990, interview, should not have been admitted, and that his trial counsel was ineffective in not objecting to the admission of those statements.

Miranda warnings are necessary only when a person is subject to "custodial interrogation." *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995). *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984), set forth four factors to consider in determining whether a suspect is in custody, triggering Miranda rights.[13] In reviewing the judge's decision, we "give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of

---

[12]A motion to suppress Vinnie's statements should have been brought before trial. Mass. R. Crim. P. 13 (c) (2), 378 Mass. 871 (1979). Instead, Vinnie's trial counsel requested a voir dire hearing well into the trial when Flaherty began to testify concerning Vinnie's statements. The judge scheduled a hearing "only because of the gravity of this case . . . [o]therwise I would determine it waived. There are certain aspects about statements such as voluntariness where I think the defendant is always entitled to have a jury make a determination and the judge make a determination." The failure to challenge statements prior to that point was apparently part of defense counsel's strategy to depict Vinnie as "always fully cooperative with a myriad of police investigations and interviews" and that at least some of the statements were "part of [the] defense." Despite this strategy, Vinnie insisted that his defense counsel challenge the admissibility of the statements. At the judge's direction, defense counsel specified the statements he challenged as the interviews on May 30, 1990, and November 2, 1991. Nonetheless, trial counsel took advantage of the voir dire hearing to elicit from Flaherty and from Vinnie details of the circumstances of all the interviews.

[13]The *Bryant* factors are: "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest." *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). We have recently clarified that, in applying the second *Bryant* factor, the undisclosed subjective belief of the interrogator as to whether the person interviewed is a suspect is immaterial; rather, courts must look to whether a reasonable person in the position of the person being questioned would not feel free to leave the place of questioning. *Commonwealth* v. *Morse*, 427 Mass. 117, 124-126 n.6 (1998).

constitutional principles to the facts found." *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995).

First, we look at the statements challenged by Vinnie's trial counsel, but admitted by the judge. The May 30, 1990, interview was conducted in Vinnie's print shop office, while the November 2, 1991, interview was conducted in his Georgia residence, neither venue suggestive of intimidation, coercion, or police advantage. On May 30, 1990, a reasonable person in Vinnie's position may have believed after seven prior interviews that he had become one of several foci of the investigation, but there was still no probable cause for his arrest at that time. Warnings are not required simply because the person questioned is one whom the police suspect. See *Commonwealth* v. *Morse*, 427 Mass. 117, 124-126 & n.6 (1998); *Jung, supra* at 689. By November, 1991, the judge found that Vinnie had become a prime suspect. In that interview, Vinnie asked Flaherty whether he thought Vinnie had killed Charles; Flaherty replied that yes, he did believe that Vinnie was the murderer. In other ways as well, that interview became confrontational. Vinnie told Flaherty to lock him up if there was a warrant, but otherwise to leave. Flaherty left. The judge found that Vinnie had a long criminal record, sufficient experience with arrest procedures and Miranda warnings, and was "no stranger to contact with law enforcement." Despite the pressure of the November interview, Vinnie asserted his right to terminate the interview, and suffered no arrest. The judge did not err in determining that Vinnie's freedom of action had not been curtailed in the circumstances of these interviews, that no right to Miranda warnings attached, and that the statements were voluntary beyond a reasonable doubt. *Commonwealth* v. *Tavares*, 385 Mass. 140, cert. denied, 457 U.S. 1137 (1982).

As for the earlier interviews, to which there was no objection at trial nor was the matter raised in Vinnie's motion for a new trial, "[a] defense counsel's strategic decisions do not constitute ineffective assistance of counsel unless they are 'manifestly unreasonable.' " *Commonwealth* v. *Parker*, 420 Mass. 242, 248 n.7 (1995), quoting *Commonwealth* v. *Bousquet*, 407 Mass. 854, 863-864 (1990). The circumstances of the earlier statements reflect fewer indicia of custody than those later interviews that the judge properly determined were noncustodial. Trial counsel's strategy not to challenge the earlier interviews was not manifestly unreasonable. Such a challenge would have failed.

As a further assurance that both the challenged and unchallenged statements were not only noncustodial but voluntary, the judge properly instructed in accordance with our humane practice rule that the jury had to find that all the defendant's statements were voluntary beyond a reasonable doubt. *Tavares, supra* at 152. There was no error in admitting Vinnie's statements to police.

5. *Admission of the victim's statements.* Testimony was admitted from several friends of Charles that Charles wanted help to beat up Vinnie, that he wanted to fight or shoot Vinnie, and that he would kill Vinnie, if Vinnie touched his mother again.[14] "The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it." *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997). See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 283 (1990). There was no evidence that Vinnie was aware of these particular threats. Charles's state of mind, if Vinnie was not aware of it, was irrelevant to any motive Vinnie may have had. It was error, therefore, to have admitted the statements in evidence. There was other significant evidence, however, that Charles had expressed hostility directly to Vinnie. Vinnie admitted his awareness of Charles's hostility. The erroneously admitted hearsay statements were cumulative of other evidence of the hostility that Charles expressed to Vinnie. Based on the other properly admitted evidence, the jury could have inferred that Vinnie's motive for the murder arose from the hostility between Charles and himself. We are convinced "that the error did not influence the jury, or had but slight effect," and can say "with fair assurance that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). Vinnie was not prejudiced by the error.

Vinnie also challenges the admissibility on hearsay grounds of testimony from Charles's tennis coach that in January, 1990,

---

[14]Vinnie's trial counsel did not object to this testimony when it was offered. On the previous day of trial, however, Vinnie's counsel objected frequently, without success, to admission as state-of-mind exceptions to hearsay of other out-of court statements by the victim. Vinnie's appellate counsel argues that further objection by trial counsel would have been futile. We consider the claimed errors, as if they had been preserved by timely renewed objection.

Charles told him about a fight he had with Vinnie. "An extrajudicial statement of a declarant is not ordinarily admissible if it is a statement of memory or belief to prove the fact remembered or believed." *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 510 (1997), quoting *Commonwealth* v. *Lowe*, 391 Mass. 97, 104, cert. denied, 469 Mass. 840 (1984). Although differing slightly from other testimony as to who shoved whom in this confrontation, it was cumulative of percipient testimony of the fight from Charles's mother and testimony from Flaherty of Vinnie's admission to the fight. The judge erred in admitting the testimony but the admission was not prejudicial. *Flebotte, supra.*

6. *Alleged grand jury improprieties and other alleged improper conduct by the prosecution.* Vinnie raises several issues of grand jury impropriety or other improper conduct by the prosecution. In his postconviction motion to dismiss the indictment or for a new trial, Vinnie alleged that unauthorized persons — three police investigators — were present during the grand jury proceedings, supporting this charge with his own affidavit and that of his daughter. Affidavits of the officers, the prosecutor, and the court reporter, as well as correspondence from Vinnie's own trial counsel, disputed this allegation, except that, as the judge found in ruling on Vinnie's motion, Flaherty was in the grand jury room before the grand jury entered and at a time when the prosecutor advised Vinnie of his rights and confirmed that Vinnie, indeed, wanted to testify. "[T]he presence of an unauthorized person before a grand jury will void an indictment." *Commonwealth* v. *Pezzano*, 387 Mass. 69, 72-73 (1982). In this case, however, Flaherty was not present before the grand jury and had left prior to the grand jury's entrance. The judge further determined that "there [was] no evidence that the officer's presence during the recorded colloquy between the prosecutor and the defendant intimidated the defendant and affected his subsequent performance before the [g]rand [j]ury." The judge did not err in refusing on this basis to dismiss the indictment against Vinnie.

Vinnie's postconviction motion also claimed that the grand jury process was flawed by false,[15] misleading,[16] and prejudicial[17]

---

[15]A serological analysis comparing the saliva of Vinnie and West with saliva found on two cigarette filters discovered at the scene of the murder determined that Vinnie's saliva was "positive" for a certain characteristic

testimony and the withholding of exculpatory evidence.[18] The judge ruled that the integrity of the grand jury proceedings was not impaired by inaccuracies in the grand jury testimony. We agree. Any inaccuracies were not told with knowing or reckless disregard of their truth for the purpose of obtaining an indictment, nor did these inaccuracies likely influence the grand jury. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 620-621 (1986); *Commonwealth* v. *Tavares*, 27 Mass. App. Ct. 637, 639 (1989). Flaherty's simplistic answer to a question on the saliva tests that, at trial, required complex testimony from a chemist, does not appear to have intentionally misstated the evidence. Any confusion in Flaherty's testimony to the grand jury as to Vinnie's route to work appears inadvertent.

We are more troubled by the Commonwealth's eliciting in the grand jury hearing testimony from West on criminal activity that he undertook with Vinnie, see note 17, *supra,* an issue that the judge did not specifically address in ruling on Vinnie's postconviction motion. In other cases, we determined that the integrity of the grand jury proceedings had not been seriously impaired by the admission of evidence of prior criminal activity, but noted that such information had surfaced inadvertently in response to a grand juror's question, not by the prosecutor's

("secretor") that, in turn, allowed further analysis that showed his saliva was inconsistent with the saliva on the cigarette filters. West's saliva was negative for the initial marker, meaning that he could not, like twenty per cent of the population, be ruled out from having smoked the cigarettes, nor positively identified with the saliva from the filters. At the grand jury hearing, Flaherty was asked the result of the test on the saliva of Vinnie and West and replied, "Negative."

[16]The alleged misleading testimony before the grand jury hearing concerned whether Vinnie, on his route to work each morning, drove to Brockton along Route 138 (also known as Blue Hill *Avenue*) or on Blue Hill *Parkway*.

[17]The prejudicial testimony at the grand jury was elicited from West concerning his involvement with Vinnie in previous criminal activities, including arson and mail fraud.

[18]The exculpatory evidence concerned a man's threat on March 13, 1992, to his wife's friend that, according to the friend, he would "take care of [her] like [he] took care of Charles Hardison." The wife asked, " 'Did you say that you killed Charles Hardison?' . . . and he said, 'Yah, yah, that's what I said.' " The wife and her friend reported the threat to the Milton police. The prosecutor and police involved in the Hardison investigation denied knowledge of the incident or the police report, until it surfaced during the course of the trial. The husband and the wife's friend testified at Vinnie's trial, recounting different versions of the words used in the threat. The husband denied involvement in the murder.

design. See *Commonwealth* v. *Freeman*, 407 Mass. 279, 283 (1990); *Commonwealth* v. *Champagne*, 399 Mass. 80, 84 (1987). Here, the Commonwealth is clearly blameworthy for presenting evidence to the grand jury that, had there been less evidence incriminating Vinnie, could have led the grand jury to indict him improperly on the basis of his propensity to commit crime, rather than on the crime charged. The use of such evidence "might have involved serious risk of prejudice." *Commonwealth* v. *Saya*, 14 Mass. App. Ct. 509, 515 (1982). "[C]ases in which we have dismissed indictments usually have involved improper statements made by the *sole* witness to appear before the grand jury." *Freeman, supra* at 284. In this case, there were multiple witnesses before the grand jury and the cumulative evidence against Vinnie was powerful. While the use of the prior misconduct evidence was improper, Vinnie "has not proved that the disputed statements, viewed in the context of all the evidence presented to the grand jury, 'probably made a difference' in their decision to indict him." *Id.* at 283, citing *Commonwealth* v. *Mayfield, supra* at 621-622.

Next, we address the issue of the exculpatory evidence, see note 18, *supra*. "Where evidence meeting the constitutional standards for materiality is initially suppressed, but then disclosed, it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.' " *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 309 (1984), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980). The evidence of the threat may have been marginally exculpatory and material to Vinnie's defense. The evidence appears only to have come to light at the trial and was fully explored at that time. The jury could evaluate that evidence, for whatever it may have been worth, and obviously discount it. Even if, however, Vinnie had shown, which he did not, that the Commonwealth was negligent in the belated disclosure of that evidence, Vinnie was able to make full use of the evidence and the late disclosure by the Commonwealth did not harm Vinnie. See *Commonwealth* v. *Lam Hue To, supra*; *Commonwealth* v. *St. Germain*, 381 Mass. 256, 263 (1980). The other claims of prosecutorial misconduct were

properly addressed and disposed of by the judge in his rulings on Vinnie's postconviction motion.[19]

7. *The stapler, the glassine bags, and the telephone records.* Vinnie next claims for the first time here that he did not consent to provide to the police certain items — staplers from his print shop and glassine bags from his stamp collection; that the items were seized by the police without warrant; and that trial counsel erred by not moving to suppress the items. We review whether errors by counsel created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Waite,* 422 Mass. 792, 807 (1996).

Flaherty testified that, on request, Vinnie consented to providing the staplers[20] and the glassine bag samples. Flaherty secured the staplers on a visit to Vinnie on April 16, 1990, and the stamp envelopes on a visit on April 19, 1990. Vinnie, at voir dire testified, "I believe [the police officers] took some staplers, three staplers on that evening." There is little in this testimony from which to conclude, in light of Flaherty's contrary testimony, that Vinnie refused consent to release of the staplers · to Flaherty. On so bare a record to support Vinnie's claim that he did not consent to Flaherty's taking the staplers, we cannot say that there was a substantial likelihood of a miscarriage of justice. Vinnie testified that he did not provide the glassine bags voluntarily, but his testimony was equivocal at best in that

[19]After Vinnie moved to interview the Commonwealth's witness, Derrick Sealy, incarcerated at the time, the judge called Sealy to see if he was willing to talk to Vinnie's trial counsel and advised Sealy that he could consent to or decline the interview. Sealy told the judge that he was willing to speak on the condition that two police officers were present. When trial counsel went to interview Sealy, Trooper Flaherty was present in the place of one of the police officers mentioned by Sealy, and Flaherty repeated to Sealy his right to speak or not speak with Vinnie's trial counsel. Sealy chose not to be interviewed at that time. Sealy's testimony on cross-examination concerning this incident reveals Sealy's complete understanding of his rights and no undue influence exerted by Flaherty on Sealy's willingness to have a pretrial interview.

Vinnie's claim that Flaherty tampered with and switched an item of physical evidence introduced at trial depends heavily on the credibility of witnesses to this incident. We defer to the judge's assessment of credibility and his resolution of this issue.

[20]Flaherty collected staplers from Vinnie, Larry Hardison, and Tracy West. He provided other staplers for Vinnie's use, in exchange for taking and holding the staplers from the print shop. Six staples found with glassine packets of white powder at the Hardison house came from one of Vinnie's staplers, according to testimony of a special agent of the Federal Bureau of Investigation who had tested and examined the staples and staplers in one of its laboratories.

regard.[21] Even if the glassine bags should have been suppressed on proper motion, however, their production at trial as physical evidence was cumulative of other testimony concerning the bags in the stamp collection. Tracy West testified to watching and assisting Vinnie fill glassine bags. Charles's mother testified that the glassine bags she found beneath Charles's bed were identical to those in Vinnie's stamp collection. Any error by trial counsel in not moving to suppress the glassine bags did not create a substantial likelihood of a miscarriage of justice.

Next, Vinnie claims that trial counsel erred by not moving to suppress records of telephone calls made to Vinnie's print shop. On April 20, 1990, the district attorney requested records from the New England Telephone Company for Vinnie's print shop telephone, pursuant to an administrative subpoena in compliance with G. L. c. 271, § 17B, set out in relevant part in the margin.[22] On May 25, 1990, Flaherty spoke with Vinnie's daughter in Columbus, Georgia. On May 30, 1990, Vinnie

---

[21]Vinnie's testimony on the glassine bags was as follows:

Q.:   "And during these same interviews, you voluntarily turned over to the police some stamp envelopes from your stamp collection, didn't you?"

A.:   "I didn't turn them over voluntarily."

Q.:   "Did they ask you if they could have some of the envelopes?"

A.:   "They did not ask me."

Q.:   "Did they ask you if you had a stamp collection?"

A.:   "They asked me if I had a stamp collection."

Q.:   "Did they ask you if they could see it?"

A.:   "They told me they needed to see it."

Q.:   "Did you let them take four or so envelopes out of the box that you had the stamps in?"

A.:   "They told me that they needed to take them."

[22]"Whenever . . . a district attorney has reasonable grounds for belief that the service of a common carrier . . . furnished to a person or location, is being or may be used for an unlawful purpose he may, acting within his jurisdiction, demand all the records in the possession of such common carrier relating to any such service. Such common carrier shall forthwith deliver to the . . . district attorney all the records so demanded."

insisted that the first time he knew of Charles's death was when Flaherty informed him on his arrival at the Hardison house at around 9:30 A.M. on April 12, 1990. Flaherty then asked whether Vinnie recalled a conversation with his daughter on the morning of April 12. Vinnie said he did and told Flaherty that during that conversation, he had informed his daughter of Charles's murder and the circumstances. The challenged telephone records showed that only one collect call had been made to Vinnie's print shop from Columbus, Georgia, during the day of April 12; that call was placed at 8:53 A.M., before the time that Vinnie acknowledged knowing about the murder.

Vinnie argues two issues regarding the admissibility of the telephone records: that the district attorney did not have "reasonable grounds for belief" that Vinnie's telephone was being used for an "unlawful purpose"; and, that the statute violates art. 14 of the Massachusetts Declaration of Rights. On the first issue, the Commonwealth argues that, by the time of the district attorney's letter asking for telephone records, Vinnie had told Flaherty of a call to Hal Pompeii close to the time of the murder, and that, therefore, the district attorney had reasonable grounds to believe that Vinnie may have used the telephone for the unlawful purpose of covering up his crime by establishing a false alibi. On the second issue, the Commonwealth urges us to accept the holding in *Commonwealth* v. *Feodoroff*, 43 Mass. App. Ct. 725, 729-730 (1997), that there is no reasonable expectation of privacy protected by art. 14 in business telephone records.

We previously have not construed G. L. c. 271, § 17B. On a threshold issue not reached in *Feodoroff, supra* at 731, we hold that a defendant may move to suppress telephone records acquired by administrative subpoena and a judge should allow such a motion if it is shown that a district attorney had no reasonable grounds for belief that the target was using the telephone for an unlawful purpose. In so holding, we emphasize that the statute does not provide the district attorney with a free hand to issue routine administrative subpoenas for telephone records absent the reasonable grounds called for in the statute. Having said that, we conclude that the Commonwealth in this case had grounds, although somewhat thin, for its belief that Vinnie had used his telephone for the unlawful purpose of fabricating an alibi. For the reasons set forth by the Appeals Court, Vinnie's constitutional attack on the statute also fails. *Feodoroff, supra* at 729-730.

8. *Failure to allow the jury to determine degree of murder.* Vinnie also claims that trial counsel erred in not requesting and the judge erred in not giving the jury the option of returning a verdict of guilty of murder in the second degree. Based on the evidence presented that Charles was executed as the intended result of a premeditated plan, no theory would have supported a jury verdict of murder in the second degree. In ruling on this issue in Vinnie's postconviction motion, the judge found that Vinnie, after consultation with and advice from his attorney, elected to limit the jury's verdict options to guilty of murder in the first degree or acquittal. This choice reflected Vinnie's tactical decision to avoid risking a compromise verdict of murder in the second degree, in the event that the jury had some doubt about the identity of the murderer. The judge concluded that the statute provides a defendant a right, similar to certain constitutional rights — whether to plead guilty, whether to waive a jury, and whether to testify at trial — that may be subject to a defendant's knowing, informed, and voluntary waiver. The judge ruled that the "defendant can and did waive his statutory right to have the jury determine the degree of murder."

By statute, "[t]he degree of murder shall be found by the jury." G. L. c. 265, § 1. In our opinions, we have held that the statutory language establishes a defendant's right to a jury's determination of the degree of murder, but we have not decided whether a defendant may waive an instruction on murder in the second degree. We have held that the statute "requires a trial judge to instruct on murder in the first and second degrees if there is evidence of murder in the first degree, even though there appears to be no hypothesis in the evidence to support a verdict of murder in the second degree." *Commonwealth* v. *Brown,* 392 Mass. 632, 645 (1984). See *Commonwealth* v. *Johnson,* 399 Mass. 14, 15 (1986). Unlike this case, the defendant in *Brown* requested an instruction on murder in the second degree, which the trial judge refused.

We take this occasion to clarify that the statute imposes a duty on the judge to give an instruction on murder in the second degree and that the jury's determination of the degree of murder is not subject to a defendant's waiver.[23] Such an instruction is not a right vested exclusively in the defendant that may be

_____

[23]We recognize, as we have before, that "[t]he statute creates an unavoidable inconsistency because a jury's obligation to find a defendant guilty of the highest crime proved beyond a reasonable doubt may conflict with the stated

waived by a defendant. The jury's power to determine the degree of murder implicates other interests, as well.[24]

Because we have not previously decided whether a defendant may waive the jury's determination of the degree of murder, we must decide whether to apply the categorical rule only prospectively, or to reverse this verdict as well. The facts of this case persuade us that, although the jury were not allowed to determine the degree of murder, the verdict should stand. Three considerations taken in unison support this conclusion. First, Vinnie not only did not object to, but invited, this error. After consultation with his trial counsel, he elected to limit the jury's verdict options. That Vinnie invited the omission of the instruction, and would have objected to its inclusion, indicates that he believed that there was no rational view of the evidence that would warrant the jury's returning a verdict of murder in the second degree. Second, the Commonwealth did not seek an instruction on murder in the second degree and acquiesced in the judge's decision to forgo such an instruction. Finally, our review of the record confirms the conclusions of the trial counsel, the prosecutor, and the judge, all of whom, familiar with the evidence and protecting all the interests at stake, saw no reason to charge on murder in the second degree. Appellate counsel, while pointing out the judge's error, fails in either Vinnie's motion for a new trial or his appellate brief, to demonstrate how the omission prejudiced Vinnie. In such circumstances, we conclude that the omission of the instruction does not require reversal.[25] We conclude that our holding here should be applied to cases tried prospectively only. Guilty verdicts returned in

---

power of the jury to decide the degree of murder." *Commonwealth* v. *Gaskins*, 419 Mass. 809, 813 (1995), citing *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977).

[24]In 1858, the Legislature revised the murder statute, see St. 1858, c. 154, and divided murder into degrees "to mitigate the harshness of the common law rule imposing a mandatory death penalty on all murderers." *Commonwealth* v. *Dickerson*, *supra* at 803 (Quirico, J., concurring). While the Legislature clearly intended to benefit at least some defendants, it was also responding to "concern about the difficulty in obtaining a conviction when the jury must choose between a verdict of guilty of murder, punishable by death, and a verdict of not guilty." *Id*. at 804. Thus, the division of murder into degrees was also intended to protect the public interest, operate in some cases to the advantage of the prosecution and "forestall the jury from taking the law into their own hands by refusing to convict of a capital offense." *Id*. at 805.

[25]In *Commonwealth* v. *Woodward*, 427 Mass. 659, 662-666 (1998), we reached a similar result in ruling both that the judge erred in acceding to the

those cases in which the jury have been prevented from determining the degree of murder, whether due to a defendant's purported waiver, the Commonwealth's objection or a judge's oversight, shall be subject to reversal.

9. We affirm the conviction and the judge's ruling on Vinnie's postconviction motion[26] and, having reviewed the full record, we find no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

defendant's "all-or-nothing" defense and that the error did not require reversal. In that case, however, the reasons for our ruling were quite distinct. The Commonwealth had requested an instruction on the lesser included offense of manslaughter and the evidence could have supported a manslaughter verdict. No statute requires that the jury receive a manslaughter instruction. The judge erred, not because of any failure to comply with a statutory duty nor because he granted the "all-or-nothing" option requested by the defendant, but because he did so over the Commonwealth's objection and refused the Commonwealth's proper request for a manslaughter instruction, to which it was entitled. The error was not prejudicial to the Commonwealth only because the jury did not choose the "nothing" option and acquit the defendant, but returned the "all" option — murder in the second degree — a verdict that favored the Commonwealth.

[26]In addition to the brief filed by Vinnie's appellate counsel, Vinnie filed pro se a supplemental brief and supplemental reply brief. We have addressed the first two issues raised. The third issue raised pro se — the circumstances surrounding the appointment of Vinnie's trial counsel — was adequately addressed by the judge in ruling on Vinnie's postverdict motion for a new trial.