Agnes, Peter W., J.
1. The defendant, Christopher Zinkievich, is charged by indictment with the offenses of Armed Burglary in violation of G.L.c. 266, §14A, Armed Robbeiy in violation of G.L.c. 265, §17, and Breaking and Entering in the Nighttime with the Intent to Commit a Felony in violation of G.L.c. 266, §16. He has filed a pretrial motion to suppress. Based on the credible evidence presented at the evidentiary hearing I conducted, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
2. I generally credit the testimony of Detective William C. Marcelonis, Jr. of the Oxford Police Department. On December 28, 2005, at approximately 5:00 a.m. he commenced an investigation of a breaking and entering crime at a single-family home located at 577 Main Street, Oxford, Mass. The victim, Elizabeth P. Malkowski, age 93, reported that she first awoke about 10:00 p.m. but fell back to sleep without getting up. About one hour later, she awoke again and went into her kitchen where she was grabbed from behind by two males. She was tied up. Fifty dollars in cash was stolen. She described her assailants as one large and one slender male. The slender male had a “baby face.” During their investigation, the police found a distinctive article of clothing at one of the far ends of the victim’s property away from her home (a black and gold South Pole sweatshirt). The victim never told the police that one of the perpetrators had worn such a sweatshirt. In the course of their investigation, the police used specially trained dogs who tracked scents detected in the victim’s home to an area about 50-60 yards away from the defendant’s home. However, this evidence did not cause the police to believe the defendant was involved in the crime at the time.
3. Detective Marcelonis learned of statements by other persons about the defendant’s involvement in the breaking and entering. The police investigation led *576 them to believe that the defendant might be able to identify the owner of the sweatshirt. On January 2, 2006, the police went to the defendant’s home at 53 Plantation Road at approximately 8:30 a.m. At this point, the defendant was a definite suspect. The police, who were in plainclothes, were admitted to the home by Wendy Griffin, the defendant’s mother. She identified a photograph of the sweatshirt as belonging to her son. She also gave her permission for the police to speak to the defendant who was 17 years old at the time. In her presence, the police showed the photograph to the defendant and asked him if he recognized it. There was no show of force by the police. No one raised his or her voice, and no weapons were drawn. The defendant stated that the sweatshirt belonged to him, that he had not seen it since he left it at Green Brier Park six days ago. The police advised the defendant and his mother that if the defendant knew anything about the break-in, he should tell the police. At this point the police left the defendant’s home. The entire interview lasted about 20 minutes.
4. That same day, at approximately 1:30 p.m., the police went to the home of Terrance Melo in Oxford, Mass. who was one of two friends the defendant told the police he was with when he lost the sweatshirt (the other being Corey Langton). Detective Marcelonis was admitted to the home by Terrance’s father. Terrance is 20 years old. Suddenly and unexpectedly, the defendant walked into the room from another part of the home and stated that he needed to speak to the police. The defendant, pointing to the shirt he was wearing, stated that “I had this on” on the night of the incident, and not the sweatshirt that he had identified earlier that day in the photograph. Detective Marcelonis asked the defendant to leave so he could conduct an interview with Terrance Melo. Terrance denied that he and Langton were with the defendant on the night of the crime in question and gave Detective Marcelonis a written statement to that effect.
5. A few minutes later, the defendant entered the room once again. The defendant stated that he was with Terrance Melo on the night of the crime and was wearing the shirt he had on. In the presence of the defendant and Detective Marcelonis, Terrance Melo stated “Why are you lying dude?”
6. At this point, the defendant and Detective Marcelonis went outside to carry on their conversation in private. Detective Marcelonis did not use any force, did not display any weapon, and did not order the defendant to do or say anything. There was no shouting or raised voices. While standing in the Melo’s driveway, Detective Marcelonis stated, “What should I believe?” The defendant stated that he had problems at home and that his girlfriend was pregnant. The defendant asked Detective Marcelonis for his business card. At this point, Detective Marcelonis left the area and drove to the defendant’s home. Detective Marcelonis had further conversation with the defendant’s mother. She told him that she wanted to be present at any subsequent police interviews with her son.
7. Four days later, on January 6, 2006, Detective Marcelonis went to Oxford High School and spoke to the police Resource Officer assigned to the school. The high school is a locked facility during school hours and visitors need permission to speak to students while school is in session. The School Resource Officer located the defendant who accompanied the two police officers to an office. No Miranda warnings were administered. There is no evidence that the defendant was told he was required to speak to the police. The police did not notify the defendant’s mother or father that they intended to interview him prior to going to the school. The defendant was not informed he was under arrest or even in custody. The defendant was not informed that he was a suspect, and the police did not say anything or do anything to communicate that fact. The atmosphere was calm. There was no show of force and no aggressive questioning. The interview was brief. Detective Marcelonis asked the defendant where at the Green Brief Park did you leave the sweatshirt? The defendant replied, “On a cement slab at Green Brier.” The interview them terminated.
8. After conducting several additional interviews, the defendant was arrested at Oxford High School on January 24, 2006. He was handcuffed and transported to the police station by the school’s Resource Officer. He was not advised of his Miranda rights at the time of his arrest. The booking process lasted for about 20 minutes.[1] The defendant was upset and crying. After he was booked, the defendant was brought to Detective Marcelonis’s office at the police station. The defendant was informed that he could make a statement. The defendant asked some questions about the differences between misdemeanor and felony charges and the circumstances under which he would be allowed to have visitors while in custody. Detective Marcelonis explained these differences and also offered his views on the differences between serving “House time” and “state prison time.” The interview terminated. The defendant was returned to the holding area. About fifteen minutes later, the School Resource Officer told Detective Marcelonis that the defendant wanted to make a statement. Detective Marcelonis retrieved a tape recorder, but did not use it. The defendant asked for a cigarette and one was provided. The defendant asked about the difference between “state and county time.” He also asked whether his girlfriend would be allowed to visit him in jail. The defendant then made a remark to the effect that “at least I’ll have friends with a clean asshole.”
RULINGS OF LAW
9. First interview of the defendant at his home: not custodial; voluntary. The first interview of the defendant conducted by detective Marcelonis took place under circumstances in which the defendant was not *577 in custody, and thus was not entitled to Miranda warnings before police questioning.
Custodial interrogation requiring Miranda warnings has been defined as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda v. Arizona, 384 U.S. 436, 444 (1966). Commonwealth v. Coleman, 49 Mass.App.Ct. 150, 153 (2000). “The crucial question is whether, considering all the circumstances, a reasonable person in the defendant’s position would have believed that he was in custody . . . Thus, if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required.” Commonwealth v. Damiano, 422 Mass. 10, 13 (1996).
There is no indication that the police exhibited any show of force, coerced or tricked the defendant into making statements, or communicated to him a belief that he was a suspect. See Commonwealth v. Conkey, 430 Mass. 139, 144 (1999) (interview of defendant at his home and with his acquiescence, not custodial); Commonwealth v. Harris, 387 Mass. 758, 765-66 (1982) (same). Also, there is no evidence that the defendant was under the influence of alcohol or drugs, or suffering from any disability. Thus, there is no evidence to suggest that these statements were other than voluntary.
10. Second interview of defendant inside Melo home: not custodial; voluntary. The second encounter between Detective Marcelonis and the defendant took place purely by chance when Detective Marcelonis visited one of the defendant’s friends. There was no evidence of “physical oppressiveness.” Contrast Commonwealth v. Sneed, 56 Mass.App.Ct. 391 (2002). Like the interview at the defendant’s home, the atmosphere was calm and relaxed, and no restrictions were placed on the defendant’s ability to leave or to terminate the interview. See Commonwealth v. Groome, 435 Mass. 201, 211-12 (2001). Additionally, as in the case of the interview at the defendant’s home, there is no evidence to suggest that these statements were other than voluntary.
11. Third interview of defendant outside Melo’s home: not custodial; voluntary. What has been said above about the interview inside Melo’s home applies equally to the brief conversation between Detective Marcelonis and the defendant outside the home.
12. Fourth interview of defendant at high school At the time of the interview, the defendant was 17 years of age, and thus not a juvenile who would be entitled to an opportunity to consult with an interested adult before being questioned. Although the record does not indicate that the defendant was ordered to appear for the interview, an inference to that effect can be drawn based on the evidence that the high school is a locked facility and that the defendant was brought to the office by the police officer assigned to work in the high school.
Neither the United States Supreme Court nor the Supreme Judicial Court has adopted a per se rule that questioning a student at school in circumstances in which the student is not free to leave the school is tantamount to custodial interrogation for purposes of Miranda. In Commonwealth v. Snyder, 413 Mass. 521 (1992), the Supreme Judicial Court assumed for the purposes of its analysis on appeal that a student who was called to the principal’s office after a search of his locker revealed the presence of drugs and questioned by school officials about selling drugs at school was custodial. However, the Court declined to recognize a special rule under Article 12 of the Declaration of Rights for questioning students at school and concluded that questioning by school officials, as opposed to police officials, did not have to be preceded by a waiver of Miranda rights (as long as the school officials were acting independently of the police).
The Snyder case does not require that any questioning of students at school by police officers be deemed custodial interrogation. The burden of proving that the setting in which police questioning takes place is custodial rests with the defendant. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999), quoting Illinois v. Perkins, 496 U.S. 292, 297 (1990).
The determination of the custody question for purposes of Miranda must take into consideration the totality of the circumstances. “In assessing the circumstances, the court considers several factors; (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest.” Commonwealth v. Groome, 435 Mass. 201, 21-212 (2001). While it is apparent that at the time of the interview the police in fact did suspect the defendant as the perpetrator and while the defendant may have assumed they did as well, there is no evidence that the police said anything or did anything that expressly communicated that suspicion to the defendant. Moreover, one’s status as a suspect, alone, in the absence of some overt act or statement by the police does not contribute to a finding that the questioning was custodial. See Commonwealth v. Vinnie, 428 Mass. 161, 171, cert. denied, 525 U.S. 1007 (1998) (warnings not required simply because person questioned is one whom police suspect). The interview took place in a place familiar to the defendant and one that, unlike a *578 police station, is not regarded as an inherently coercive atmosphere. The defendant was not advised he was under arrest, and there was no indication that he was not free to go back to class.
Ultimately, “[i]n determining whether there was custodial interrogation we look at how a reasonable person in the juvenile’s position would have understood his situation.” Commonwealth v. Ira I., 439 Mass. 805, 814 (2003). What is most significant in this case is that the interview lasted only a few minutes. It did not involve the type of “significant” restraint on personal liberty that the Miranda court was concerned about. See Miranda v. Arizona, 384 U.S. 436, 478 (1966). In these circumstances, the defendant has not met his burden of establishing that the questioning at his school was custodial.[2] This result in is keeping with the result in other cases in which courts have considered a similar question. See State v. Polcano, 658 So.2d 1123 (Fla.Dist.Ct.App. 1995); In re Darryl T., 210 A.D.120, 620 N.Y.S.2d 65 (N.Y.App.Div. 1994); In re Haubeil 2002 WL 1823001 (Ohio App. 2002); State v. RDS, 2006 WL 699 (Tenn.Ct.App. 2006); State v. R.B., 92 Wash.App. 1054 (Wash.App.Div. 1998).
There is no evidence to suggest that the defendant’s statement to school officials was not voluntaiy.
13. Post-arrest interview of defendant at police station; no Miranda rights. The above Findings of Fact establish that the defendant was placed under arrest at his school and then transported to the police station. He was booked and then questioned by Detective Marcelonis. “It is fundamental that a statement made by a criminal defendant in response to questions while in police custody must be preceded by Miranda warnings in order to be admissible against him.” Commonwealth v. Bly, 448 Mass. 473, 492 (2007), quoting Commonwealth v. Haas, 373 Mass. 545, 552 (1977), S.C., 398 Mass. 806 (1986). Here, the defendant was in custody and was subject to police interrogation. He was not advised of his Miranda rights. Thus, any statements he made following his arrest were obtained in violation of Miranda and must be suppressed.
ORDER
For the above reasons, the defendant’s Motion to Suppress is ALLOWED IN PART and DENIED IN PART. The statements made by the defendant following his arrest at school are suppressed as the product of a violation of Miranda. Otherwise, the motion to suppress is DENIED.

There was testimony at the hearing from a police officer who said he had a recollection of advising the defendant of his Miranda rights at booking and of the defendant signing a written waiver form. The police were unable to locate a written waiver. The officer also testified that it was not his practice to give persons in police custody Miranda warnings in all cases. I do not credit the testimony that Miranda rights were administered to the defendant.

Obviously, as the Snyder case suggests, there are other circumstances in which police questioning of a student at school will be regarded as custodial interrogation that must be preceded by a waiver of Miranda rights. There are so many competing interests at stake when the police come to a school in session to question a student that it would seem advisable for prosecutors, police, and school officials, in consultation with parent organizations, to consider developing a protocol governing such situations that would include a clear statement for the benefit of the student that he or she is not required to speak to the police.