## COMMONWEALTH vs. AARON S. GANT

No. 99-P-377.

Bristol. October 12, 2000. - April 11, 2001.

Present: GREENBERG, KAPLAN, & DUFFLY, JJ.

*Search and Seizure,* Probable cause. *Constitutional Law,* Search and seizure, Probable cause. *Probable Cause. Controlled Substances. Grand Jury. Practice, Criminal,* Grand jury proceedings, Required finding. *Evidence,* Expert opinion. *Witness,* Expert.

At the trial of indictments for distribution of cocaine and related charges, the judge correctly denied the defendant's motion to suppress evidence where the police, who were experienced narcotics officers, had probable cause to arrest the defendant after observing the defendant make what appeared to them to be a drug transaction in a high crime area. [316-319]

A police officer's inaccurate testimony before a grand jury regarding another officer's observations of a drug transaction was inconsequential, where even had the officer testified accurately there would have been probable cause to indict the defendant. [319-321]

At the trial of an indictment alleging distribution of a controlled substance, police officers' characterization of, and opinion testimony relating to, the transaction they witnessed was not prejudicial to the defendant in light of the strength of the Commonwealth's case. [321]

Sufficient evidence warranted the jury's verdict of guilty on a charge of unlawful possession of a firearm. [321-322]

INDICTMENTS found and returned in the Superior Court Department on December 19, 1996.

A pretrial motion to suppress evidence was heard by *Raymond J. Brassard,* J., and the cases were tried before him.

*Francis E. Scheele* for the defendant.

*Elspeth B. Cypher,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. The only real issue at the defendant's trial for unlawful distribution of cocaine and related charges was whether he was the individual involved in a street exchange with Juanita Gonzalez just outside the Band Club in the city of New Bedford.

The defendant moved pretrial to suppress material evidence — a three-gram bag of cocaine, a cellular telephone, a loaded semi-automatic pistol, and $434 in cash — that had been seized in consequence of what the police intended to be an arrest inside the men's room of the Band Club. Following an adverse ruling after a hearing, the defendant was convicted of unlawful distribution of a class B substance, possession of a class B substance (two counts), and unlawful possession of a firearm. On appeal, the defendant contends as follows: first, that the judge erred in denying his motion to suppress; second, that because the Commonwealth submitted allegedly false testimony to the grand jury, he was effectively deprived of a fair and impartial grand jury hearing; third, that the judge mistakenly admitted opinion testimony at trial; and fourth, that he was entitled to a required finding of not guilty on all of the charges.

1. *Facts.* We recite the subsidiary facts found by the motion judge supplemented by uncontroverted testimony. On September 21, 1996, at 11 P.M., Sergeant Albert J. Pacheco was on undercover patrol in an unmarked cruiser near Monte's playground on Acushnet Avenue, a high-crime area. While stopped in traffic behind several cars, he saw the defendant, with whom he was familiar, standing in front of a bar known as the Band Club. Pacheco circled around the block to observe the defendant inconspicuously. On the second pass, he observed Gonzalez, clad in a bright floral dress, approach the defendant. Another unidentified male wearing a hooded sweatshirt stood about five feet away. After a brief conversation, Gonzalez and the defendant moved closer together. It appeared to Pacheco from his vantage point (he was parked two car lengths from where they stood on the same side of the street) that they were looking down at their hands. He saw the defendant exchange something with Gonzalez, but could only make out a white piece of paper in her hands.

The judge found that Pacheco thought a drug sale had taken place. Pacheco then promptly called undercover officers of the narcotics division of the New Bedford police. He told them that a drug exchange had just occurred in front of the club and instructed them to proceed to the scene.

Detectives Richard Netinho and Mark Stone were the first of-

ficers to arrive at the scene. They observed Gonzalez drop two folded pieces of white paper on the sidewalk just as they arrived and saw the defendant go inside the club. Stone picked up the papers, unfolded one, and saw that it contained a white powder that he believed to be cocaine. He gave this information to Netinho who then placed Gonzalez under arrest. As the two officers were arresting Gonzalez, Detectives Paul Oliveira and Kelly Botelho arrived at the scene. Netinho then instructed them to "go inside and grab Gant." All four officers testified that no identification was necessary since they all knew him.

Oliveira and Botelho entered the Club and noticed about ten patrons, but the defendant was nowhere in sight. They walked into the men's bathroom and were joined by Netinho moments later. It was a small restroom, with one commode and one sink. There were two doors, one that opened from the club proper to an inside hall and another to the bathroom itself. While standing in the hall, and before entering the bathroom, Oliveira heard a loud "clanking" noise. Oliveira and Botelho strode inside the bathroom and saw the defendant, his arm extended toward a small metal trash can. The officers immediately placed the defendant under arrest. As Oliveira was handcuffing the defendant, he discovered a cellular phone and a small bag of cocaine. The police also confiscated $434 that was on the defendant's person. In the midst of the arrest and attendant commotion, Botelho, who had observed a nine millimeter semiautomatic handgun in the trash can, upended the can and the weapon slid out onto the floor. That circumstance led the defendant to exclaim, "It's not my gun." During a pat-down search of the defendant at the police station, the police also discovered eight small bags of marijuana, two beepers, and a pair of gloves.

For her part, Gonzalez testified that the transaction that Pacheco witnessed did not involve the defendant. Rather, she claimed to have made her purchase from the hooded unidentified person who appeared in front of the club at the same time she ran into the defendant. As to conversation with the defendant, she testified that she had merely asked whether he had seen her son.

2. *The suppression issue.* Because the judge's findings of fact

about the exchange are warranted by the evidence, and the defendant makes no valid argument that they are tainted by clear error, see *Commonwealth* v. *Clermy*, 421 Mass. 325, 328 (1995), we proceed to "make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found,' " *Commonwealth* v. *Robbins*, 407 Mass. 147, 151 (1990) (citation omitted). *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

We conclude that *Commonwealth* v. *Kennedy*, 426 Mass. 703 (1998), disposes of the defendant's argument that the police had no probable cause to arrest him. The motion judge did not have the benefit of that decision, as it was decided two years after the trial of this case. The *Kennedy* court held that, to establish probable cause to arrest for a sale of controlled substances, there is no "per se" rule that the officer must see the object exchanged. *Id.* at 710.[1] The *Kennedy* case exemplifies cases in which an amalgam of factors combine to create probable cause. For collected cases, see Smith, Criminal Practice and Procedure §§ 108-113 (1999 Supp.). Two of the most common occurrences that recur here are suspicious conduct in an area where officers had made arrests for narcotics violations or other crimes, see *Commonwealth* v. *Clermy*, 421 Mass. at 330; *Commonwealth* v. *Patti*, 31 Mass. App. Ct. 440, 441-442 (1991), and the fact that experienced officers observed conduct that, in their opinion, was consistent with a drug sale. See *Commonwealth* v.

---

[1]In the *Kennedy* case, *supra* at 704, an experienced narcotics officer was patrolling a downtown area of Lawrence that was a so-called "high crime area, high drug area," when he observed a vehicle pull up and park on the corner. The officer then observed an individual, who was known by the police to have been arrested previously for narcotics sales, approach the passenger side of the vehicle. He leaned down, put his head in the open car window and exchanged words with the driver and sole occupant, who later was determined to be the defendant. Without more, he turned and ran, but within a few minutes he returned and reached into the vehicle. It appeared to the officer that something was exchanged. He then walked away, and Kennedy drove off. The officer immediately followed the vehicle driven by Kennedy and signaled him to stop. Kennedy appeared to the officer to be "nervous and fidgety" so he ordered him out, frisked him, and subsequently discovered two rocks of crack cocaine. *Id.* at 704-705. Kennedy was arrested and convicted of illegal possession of cocaine and conspiracy to violate the controlled substance laws. In these circumstances, the *Kennedy* court concluded that the officer had probable cause to arrest and search the defendant even though the officer did not see the object exchanged. *Id.* at 708-711.

*Santaliz*, 413 Mass. 238, 241 (1992); *Commonwealth* v. *Johnson*, 32 Mass. App. Ct. 355, 358-359 (1992).

What makes the question close in this case is that the judge made no finding — and the record contains nothing — to demonstrate the police officer's knowledge of the reputations of Gonzalez or the defendant as drug dealers or users. Contrast *Commonwealth* v. *Kennedy*, 426 Mass. at 709 & n.5. Nor did the judge find that the area where the transaction took place was frequented by drug traffickers. Even so, we think that the parts of the exchange Officers Pacheco and Netinho each observed outside the club made up for this deficiency. Both officers were engaged in a cooperative effort in the investigation of this incident so that we may consider the complete picture. *Commonwealth* v. *Gullick*, 386 Mass. 278, 283 (1982) (probable cause formed on the basis of collective observations of police). See *Commonwealth* v. *Wooden*, 13 Mass. App. Ct. 417, 421-422 (1982); *Commonwealth* v. *Zirpolo*, 37 Mass. App. Ct. 307, 311 (1994). A reviewing court may consider the "whole silent movie," *Commonwealth* v. *Santaliz*, 413 Mass. at 242, disclosed to the eyes of an experienced narcotics investigator rather than "scrutinize in isolation" each of the facts and circumstances known to the officers. *Commonwealth* v. *Kennedy*, 426 Mass. at 708.

Taken together, Pacheco and Netinho observed several things that would warrant a prudent person in believing that the defendant was committing a crime: (1) Pacheco saw the defendant was holding what appeared to be a white piece of paper in his hand, which was rapidly exchanged with Gonzalez; (2) the defendant reacted with behavior reasonably interpreted to be evasive when Netinho drove up; (3) the encounter was in a place known to the police as having a high incidence of drug trafficking; and (4) Gonzalez immediately discarded the paper when Netinho approached. Netinho did not arrest or even stop the defendant until after Gonzalez dropped the paper. As we said in *Commonwealth* v. *Rivera*, 27 Mass. App. Ct. 41, 43 (1989), "It may be assumed that no one of these elements, standing alone, would suffice to establish probable cause for arrest and search. However, it is settled by numerous decisions that a concurrence of the [above] factors . . . readily cumulate to provide probable cause."

The motion judge could also credit Pacheco's twelve years of work with the New Bedford drug control unit. Past decisions afford great weight to such experience. See, e.g., *Commonwealth* v. *Alvarado*, 420 Mass. 542, 551 (1995). In a case that reaches the "outer limits" of probable cause, the practiced eye of an officer is significant. Compare *Commonwealth* v. *Silva*, 366 Mass. 402, 407 (1974).

Of the two men around Gonzalez, Pacheco saw and recognized the defendant as the one who moved closer to her before the exchange took place. Upon the arrival of Netinho and Stone, Gonzalez dropped the paper containing cocaine, and the defendant walked into the club. See and compare *Commonwealth* v. *Mitchell*, 353 Mass. 426, 427-428 (1967); *Commonwealth* v. *Alabarces*, 12 Mass. App. Ct. 958, 959 (1981) (no finding of probable cause where defendant exchanged something with another person for money and walked away when officers approached). The exchange here resembles the one described in *Commonwealth* v. *Hill*, 49 Mass. App. Ct. 58, 60 (2000), in which the sale the police officers observed happened within a short period of time in a public place. In that case, a series of unusual moves by the participants viewed through the eyes of a reasonable and cautious police officer, guided by his experience and training, were sufficient to support a finding of probable cause.

The defendant cites *Commonwealth* v. *Wooden*, 13 Mass. App. Ct. 417 (1982), for the proposition that Gonzalez's discarding of the paper may not be considered as a factor in determining probable cause. Although this conduct, in and of itself, was held in *Wooden* to be too speculative to have inferential value, we did conclude in that case that the defendant's arrest was based on probable cause because the act of concealment existed "in conjunction with other circumstances." *Id.* at 422, quoting from *Commonwealth* v. *Bacon*, 381 Mass. 642, 646 (1980).

3. *Alleged false testimony presented to the grand jury.* The defendant argues that the integrity of the grand jury was impaired because of Detective Netinho's testimony. There is a basis to argue (as the defendant does) that Netinho misrepresented the case against the defendant by recounting Pacheco's observations as follows: "In front of Sergeant Pacheco they did

a transaction. Miss Gonzalez gave some U.S. currency to Mr. Gant. Mr. Gant went into his pocket and pulled out a plastic bag and dumped some stuff into some paper, which Miss Gonzalez then folded up. At that point, they started to walk towards the [B]and Club." Pacheco, himself, did not appear as a witness before the grand jury.

The inaccuracy of Netinho's grand jury testimony is further illustrated by the transcript of his testimony at the hearing on the motion to suppress. During his direct examination, the prosecutor asked him about the source of his information as he arrived on the scene. The question posed was as follows: "[D]id [Pacheco] tell you that he observed cocaine . . . being passed [from the defendant to Juanita Gonzalez?]" He answered, "No, sir, he did not." There is no doubt that Netinho's grand jury testimony contradicts Pacheco's testimony at the hearing on the motion to suppress. Such a stark difference cannot be chalked up to a "mistake" as the Commonwealth contends.

To obtain a dismissal, however, the defendant must show that the false testimony (1) was given either with knowledge that it was false or deceptive or in reckless disregard of the truth, (2) was material to the question of probable cause and probably influenced the grand jury to indict, and (3) was presented with the intention of obtaining an indictment. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621-622 (1986).

It is on the "materiality" aspect that the defendant's position breaks down. We do not know from the record whether Netinho had access to Pacheco's written report of the incident prepared after the defendant's arrest. Assuming, for purposes of our analysis, that he did, the difference in his testimony as to one aspect of the exchange would have had a "negligible effect on [the grand jury's] decision to indict." *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 754 (1995), quoting from *Commonwealth* v. *LaVelle*, 414 Mass. 146, 151 n.2 (1993). To conclude otherwise in this instance would require a degree of specificity of proof not necessary to the grand jury's function as an investigative body, the scope of whose inquiries is limited to determining probable cause. See *Commonwealth* v. *Petras*, 26 Mass. App. Ct. 483, 489 (1988). Our conclusion on this point is informed by another consideration, that is, the defendant's

failure to raise the issue by filing a motion to dismiss the indictments. See *Commonwealth* v. *Mayfield*, 398 Mass. at 622 n.4; *Commonwealth* v. *Tavares*, 27 Mass. App. Ct. 637, 638 (1989). Our review, then, is limited to whether there is a substantial risk of miscarriage of justice. *Id.* at 639. Viewed in this context, Netinho's misrepresentation seems inconsequential because, even with the less incriminating version of the exchange, there was probable cause to indict.

4. *Evidentiary issues.* The defendant argues that Pacheco's testimony at trial, which described the exchange with Gonzalez as "consistent with every drug deal I've ever seen on the street," and Netinho's testimony that the defendant was a "distributor of marijuana" amounts to impermissible opinion evidence. Timely objections to all of this evidence were made at trial. It is settled that, on proper foundation, the Commonwealth may offer expert testimony regarding matters outside the realm of common experience, including special knowledge in narcotics cases. *Commonwealth* v. *Johnson*, 413 Mass. 598, 603-604 (1992); *Commonwealth* v. *Sendele*, 18 Mass. App. Ct. 755, 759 n.14 (1984) ("[t]he importance of testimony by experts in drug cases is manifest from the decisions").

It is true that we have viewed semantic locutions such as "consistent with" to serve no educative function. *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 581 (1998). "The better practice in drug cases, especially when an expert is a percipient witness, is to confine opinion testimony to the explanation of the specific unusual or cryptic conduct, without stating, in any form, whether such conduct amounts to a criminal offense." *Ibid.* Assuming without deciding that the two officers' characterizations crossed the line, there was no prejudice to the defendant in light of the strength of the Commonwealth's case. Given their testimony of what occurred outside the club, and of those officers who arrested the defendant inside the restroom of the club, it is highly unlikely that their statements played much of a role, if any, in the jury's verdict.

5. *Denial of required finding of not guilty.* Although there were percipient witnesses, none of the officers actually saw the defendant holding the gun that fell from the trash can inside the restroom. No fingerprints were found on the weapon. On that

basis, the defense argues that the evidence pointed equally to other customers in the club, which was located in a district notorious for many shootings. To get over the bar described in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), the Commonwealth need not examine all other possibilities as to how the crime was committed. See *Commonwealth* v. *Holmes*, 32 Mass. App. Ct. 906, 907 (1992). Testimony at trial established that Oliveira saw the defendant leaning away from the trash can, with his left hand extended close to it, and a clanking sound coming from that metal receptacle. A rational jury could have found from the evidence that the defendant possessed the gun and, upon seeing the police enter, dropped the gun in the trash can.

*Judgments affirmed.*