NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13408
SJC-13409


COMMONWEALTH  vs.  CASSANDRA L. BARLOW-TUCKER.

COMMONWEALTH  vs.  MATTHEW J. TUCKER.



Berkshire.     October 4, 2023. - January 8, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Homicide.  Reckless Endangerment of a Child.  Grand Jury.
    Evidence, Grand jury proceedings.  Probable Cause.
    Practice, Criminal, Grand jury proceedings, Dismissal.



    Indictments found and returned in the Superior Court
Department on March 23, 2021.

    Motions to dismiss were heard by John A. Agostini, J.

    The Supreme Judicial Court on its own initiative
transferred the cases from the Appeals Court.


    Jennifer K. Zalnasky, Special Assistant District Attorney,
for the Commonwealth.
    Joshua M. Daniels for Matthew J. Tucker.
    Nancy A. Dolberg, Committee for Public Counsel Services,
for Cassandra L. Barlow-Tucker.

CYPHER, J.  In March 2021, a grand jury returned indictments charging the defendants, Cassandra L. Barlow-Tucker (Cassandra) and Matthew J. Tucker (Matthew) (collectively, Tuckers), with one count each of involuntary manslaughter by way of wanton or reckless conduct, G. L. c. 265, § 13, and reckless endangerment of a child, G. L. c. 265, § 13L, in connection with their alleged failure to seek medical treatment for Garrett,[1] a foster child who died in their care from complications of group A beta hemolytic streptococcus (strep throat), bronchopneumonia, and a collection of fluid in one of his lungs.[2]  Following a nonevidentiary hearing, a Superior Court judge allowed the defendants' motions to dismiss the indictments on grounds that (1) the evidence presented to the grand jury was insufficient to justify the return of the indictments, see Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982); and (2) the integrity of the grand jury proceeding was impaired by the Commonwealth's presentation of improper evidence, see Commonwealth v. O'Dell, 392 Mass. 445, 446-447 (1984).  In so concluding, the judge determined that the evidence was insufficient to support a finding of probable cause to believe that the Tuckers were wanton or reckless, or knew or should have known that Garrett

---

[1] We refer to children in this opinion by pseudonyms.

[2] For ease of identification, we refer to the defendants by their given names.

was in grave danger from his illness and failed in their duty to seek medical care that could have saved his life; the judge also determined that the grand jury were impaired by the admission of improper evidence. The Commonwealth appealed, and we transferred the cases sua sponte from the Appeals Court.

On appeal, the Commonwealth argues that the motion judge erred in dismissing the indictments because (1) viewed in the light most favorable to the Commonwealth, the evidence provided probable cause to support the indictments for involuntary manslaughter and reckless endangerment of a child; and (2) the integrity of the grand jury was not impaired where the evidence presented was not untruthful or misleading, and where the prosecutor provided limiting instructions before the grand jury deliberated. The Commonwealth also argues that the judge incorrectly applied the McCarthy and O'Dell analyses in his determinations.

Because we conclude that the evidence before the grand jury was sufficient to support the defendants' prosecution for involuntary manslaughter and reckless endangerment of a child and that the integrity of the grand jury was not impaired, we reverse the order of the judge in the Superior Court.

1. Background. We summarize the evidence presented to the grand jury in the light most favorable to the Commonwealth, see

Commonwealth v. Clinton, 491 Mass. 756, 758 (2023), reserving some details for subsequent discussion.[3]

On the morning of February 18, 2020, Cassandra discovered their ten month old foster child, Garrett, nonresponsive in his crib. She immediately alerted Matthew to call 911. Emergency personnel responded but were unable to revive him.

The investigation into Garrett's death revealed that he had been sick with a severe respiratory cold in the weeks leading up to his death. Video footage from the Tuckers' home surveillance cameras recorded his last night alive, February 17.

a. Video footage. The Tuckers described February 17 as the best day Garrett had had in a long time. He had a better appetite, drank more fluids, and was more active than he had been recently.

---

[3] The grand jury heard testimony from five witnesses over the course of three days: Detective Travis Cunningham, the detective who first arrived at the scene after Garrett's body had been discovered; Sergeant Ryan Dickinson, the lead investigator on the case; Dr. Irini Scordi-Bello, the forensic pathologist who conducted the autopsy; Dr. Sandeep Kumar, Garrett's pediatrician; and Tracy (a pseudonym), a speech language pathologist who asked Cassandra whether Garrett had seen a doctor. The grand jury also saw recorded interviews of Cassandra and Matthew that were conducted by the police, as well as surveillance video footage of the children's room where Garrett was discovered. The grand jurors were provided with recorded interviews of four Department of Children and Families (DCF) social workers, interviews of the Tuckers' two eldest children, and various medical and DCF records to assist them in their deliberations.

That night, Adam, the Tuckers' eldest son, put Garrett to bed.[4]  The motion-activated video camera in the room showed Adam put Garrett in his crib at 6:23 P.M.  From the video recording (video), Garrett can be heard coughing prominently, wheezing, and gasping for air.  Between 6:30 and 7:17 P.M., Matthew entered the room to put Bobby, the Tuckers' adopted son, to bed.  In order to do so, Matthew walked by Garrett's crib to Bobby's bed.  Matthew then left the room without checking on Garrett.  While Matthew was in the room, Garrett continued to cough, wheeze, and gasp for air.  At around 7:30 P.M., the video showed Garrett moving and making noise.  It appeared that the last time Garrett moved was 7:34 P.M.  The camera next activated at around 12:30 to 12:44 A.M., when Adam got out of bed and left the room.  Garrett appeared on the surveillance video in the crib, motionless and not making any noise, in the same position he was in at 7:34 P.M.  Adam last activated the camera at 1:44 A.M.  At around 8:30 A.M., Cassandra discovered Garrett and contacted emergency officials.

When interviewed by police, Cassandra provided a detailed statement recalling how she had put Garrett to bed that night.  However, the surveillance video showed that it was Adam, not

---

[4] At the time, the Tuckers lived with their two biological children -- Darlene, an eleven year old girl, and Adam, a ten year old boy -- as well as their two adopted children:  Bobby, a three year old boy, and Jessica, a two year old girl.

Cassandra, who put Garrett into his crib. She also stated that, at around 3 or 3:30 A.M., she observed Garrett moving and coughing on the surveillance video. Officers noted that this statement was inconsistent with the video footage, which showed Garrett in the exact same position from 7:34 P.M. until he was discovered the following morning.

b. Weeks preceding death. According to the Tuckers, around January 25, 2020, the household members became stricken with a cold that their eldest daughter, Darlene, had brought home from school. Garrett's symptoms included a fever, cough, dry diapers, noisy breathing, lethargy, mucus, and congestion. His fever lasted for two weeks but fluctuated depending on the amount of food he ate. When he was able to drink fluids, Garrett made a "gasping" type sound. To treat Garrett's illness, the Tucker's alternated giving him children's ibuprofen and Tylenol, one as an anti-inflammatory and one as a pain reliever; hydrated him by administering liquids into his mouth with a syringe; gave him nebulizer treatments with albuterol; and attempted to hydrate and feed him when he was able to consume meals.[5] At one point, the Tuckers called a doctor about

---

[5] On December 10, 2019, Garrett's pediatrician prescribed a nebulizer with albuterol to treat a suspected environmental or pet allergy from Garrett's former foster placement. The DCF social worker who took him to the appointment, Helen (a pseudonym), filled the prescription and returned Garrett to the Tuckers with instructions about the nebulizer. Cassandra began

their two year old daughter, Jessica, to inquire about treatment for her illness, because she also contracted a cold during this time and had preexisting medical conditions.  Her cold symptoms included a cough and runny nose for a week, lethargy, and a temperature that never exceeded 100.4 degrees.  The doctor advised them to remain at home because he did not want to introduce Jessica to the germs in the doctor's office.  The doctor provided assistance over the telephone.

While the other children recovered from the illness, Matthew noted that Garrett was taking longer to recuperate. Cassandra stated that she contacted people at the Department of Children and Families (DCF) in the first week of February to notify them that Garrett was sick and needed to see a doctor. According to her, Helen, a DCF social worker, took Garrett to a doctor's appointment in February and, after the appointment, was told to continue the nebulizer treatments.  However, police were unable to locate any information to corroborate that Cassandra contacted DCF or that Garrett saw a medical professional.  Helen stated she did not take Garrett to the doctor in February.

On February 14, Tracy, a speech pathologist, visited the home to perform services with the Tuckers' youngest daughter.

---

administering the nebulizer as needed and noted that Garrett appeared to be responding well.  By early January 2020, Garrett was healthy and doing well.

While in the home, Tracy saw that Garrett was ill and struggling with a persistent cough and a respiratory cold. She observed Cassandra give him a nebulizer treatment. Tracy recalled inquiring whether Garrett had seen a doctor. Cassandra commented that if his condition worsened, she intended to call or bring him to a doctor. Between themselves, the Tuckers noted that if Garrett did not improve, they should take him to see a medical professional. Cassandra "half-jokingly" mentioned on Sunday, February 16, that they should take one of the other children to the doctor and have the doctor examine Garrett while at the office. There is no record that Garrett was seen by a medical professional between a December 10, 2019, doctor's appointment and death.[6]

    c. <u>Autopsy and medical testimony</u>. Dr. Irini Scordi-Bello, the forensic pathologist who performed Garrett's autopsy,

---

[6] For unknown reasons, Garrett missed a December 18 follow-up appointment, and an administrative transfer of his medical provider to a closer office was delayed and may not have occurred. According to Cassandra, with respect to her other foster children, depending on the social worker, either the Tuckers or the social worker would take the foster child to doctor's visits. In this case, according to Cassandra, either the assigned social worker or a social worker on the unit would take Garrett to his appointment. Cassandra stated that she never took Garrett to the doctor. If Garrett required a doctor's visit, the Tuckers would contact DCF to make the arrangements. However, based on their training, the Tuckers were aware that, in an emergency, they could take the child to the emergency room or urgent care and possessed the authority, delegated from DCF, to arrange for medical care on the child's behalf.

determined the cause of death to be complications from strep throat, bronchopneumonia, and a collection of fluid in his right lung. She noted that he had a "massive overwhelming infection in the right lung" and bacteria in his bloodstream indicating sepsis, which meant that the bacteria had circulated to his other organs. The infection caused the right lung to be "shrunken and collapsed," and pus filled the entire right chest cavity. A toxicology report indicated that no drugs or medications were found in his system.[7]

After reviewing Garrett's medical records, Scordi-Bello suggested that a wheezing diagnosis from December was unrelated to the cause of death. She did not see evidence of asthma or other changes that would suggest his condition at death was related to wheezing, asthma, or other allergies he was diagnosed with in December. Similarly, she did not believe a gastrointestinal rotavirus that he had had in December was related to or caused the pneumonia and fluid collection in his lung. That Garrett was substance exposed at birth also did not change the determination of the cause of death. Scordi-Bello noted that at the time of the December 10 appointment, Garrett's

---

[7] Tylenol would show on a toxicology report, although Scordi-Bello was unsure whether ibuprofen or albuterol would. Even if Garrett had been administered albuterol, she did not believe that it would have made an impact, because Garrett's improperly functioning lung was not able to receive air from the airway that the albuterol opened.

doctor described equal breath sounds on both sides of his lungs. That finding was inconsistent with the autopsy results, which showed that, in the days before his death, Garrett would not have had equal breath sounds because no air would have been circulating due to his shrunken right lung.

Scordi-Bello could not state definitively how the symptoms would manifest but believed that, in the days leading up to his death, Garrett would have exhibited varying degrees of fever, a cough, and difficulty breathing, which could "wax and wane."

Scordi-Bello added that Garrett likely was lethargic because of the overwhelming infection. She could not comment on whether he was improving or eating, but she thought that he would have been ill in the days prior to death. Last, she noted that the condition was treatable by administering antibiotics and draining the fluid from the lung and chest cavity.

Dr. Sandeep Kumar, Garrett's pediatrician, testified that he had not seen Garrett since his December 10, 2019, appointment when Kumar prescribed albuterol for Garrett's wheezing with instructions to the DCF worker to use the nebulizer for two more days. Kumar reviewed the autopsy report and noted that strep throat was rare in infants Garrett's age but treatable with penicillin. Kumar stated that bronchopneumonia, also treatable with antibiotics, commonly developed as a secondary infection when a child had a cold and would cause the fever to spike over

101 degrees after five to seven days of illness. Based on Garrett's laboratory results, Kumar would expect Garrett to have had a worsened cough, poor appetite, difficulty breathing, and lethargy. Kumar opined that a lay person may see a nonstop, persistent cough. Further, if a child presented to his clinic with Garrett's X-rays, Kumar immediately would have transferred the child to the emergency room.

Kumar also reviewed the video of Garrett in his crib the night before he was discovered dead. Kumar opined, based on his medical expertise, that the persistent, nonstop coughing was caused by the fluid in Garrett's chest pushing the breathing tube to one side, narrowing the airway and forcing Garrett to cough to breathe, which was also known as "air hunger." Kumar further opined that Garrett would have been exhibiting symptoms of "air hunger" for at least five to seven days. If Kumar had seen a patient with the "air hunger" breathing combined with Garrett's X-rays, Kumar would have called 911.

None of these symptoms was present when Kumar last saw Garrett in December.

After a grand juror requested that a portion of the crib video be played, Kumar stated that the nonstop cough exhibited in the video was a sign that Garrett's airway was about to be blocked, and that he was in obvious respiratory distress based on the heavy breathing and head nodding that would be apparent

to a caregiver whether or not the caregiver had child care experience. If a patient presented with these symptoms, along with the symptoms described by the Tuckers, including fever over the course of two weeks, dehydration, and an unproductive cough that turned to a phlegmy cough, Kumar would have taken the child to the emergency room.

2. Discussion. "Our review of the propriety of any indictment is limited to determining whether the grand jury received sufficient evidence to find probable cause for arrest . . . and whether the integrity of the grand jury proceedings was impaired." Commonwealth v. McGahee, 393 Mass. 743, 746-747 (1985). "In considering a judge's decision to dismiss for lack of sufficient evidence [to support an indictment], we do not defer to the judge's factual findings or legal conclusions. . . . Rather, our review is de novo" (quotation and citations omitted). Clinton, 491 Mass. at 765. Likewise, because the judge decided the motions following a nonevidentiary hearing, we review the judge's decision to dismiss for impairment of the grand jury de novo. See Commonwealth v. Sullivan, 492 Mass. 36, 41-42 (2023).

a. Sufficiency of the evidence. Although, in general, a "court will not inquire into the competency or sufficiency of the evidence before the grand jury" (citation omitted), Commonwealth v. Robinson, 373 Mass. 591, 592 (1977), a "grand

jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him [or her]" for the charged offense, McCarthy, 385 Mass. at 163.  "Probable cause is a 'considerably less exacting' standard than that required to support a conviction [beyond a reasonable doubt] at trial."  Commonwealth v. Stirlacci, 483 Mass. 775, 780 (2020), quoting O'Dell, 392 Mass. at 451.  It requires only "sufficient facts to warrant a person of reasonable caution in believing that an offense has been committed."  Commonwealth v. Levesque, 436 Mass. 443, 447 (2002).

   i.  Involuntary manslaughter.  The elements of manslaughter are derived from common law, as Massachusetts has not defined the offense by statute.  See Levesque, 436 Mass. at 447.  Involuntary manslaughter is "an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct" (citation omitted).  Commonwealth v. Catalina, 407 Mass. 779, 783 (1990).  Wanton or reckless conduct usually consists of an intentional act but may be satisfied by an intentional omission where there is a duty to act.  See Commonwealth v. Hardy, 482 Mass. 416, 421 (2019); Levesque, supra at 448.  Wanton or reckless conduct "does not require that the actor intended the specific result of her conduct, only that he or she intended to do the wanton or

reckless act," Hardy, supra, "which conduct involves a high degree of likelihood that substantial harm will result to another," Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). See Commonwealth v. Dawson, 490 Mass. 521, 533 (2022). Either the defendant must have realized the risk of harm or a reasonable person, who knew what the defendant knew, would have realized such risk. Hardy, supra.

In concluding that the Commonwealth failed to establish probable cause to support the indictments for involuntary manslaughter, the motion judge stated that the evidence was insufficient to believe that the Tuckers knew or reasonably should have known that, by caring for Garrett at home without seeking urgent medical care, they were putting him at risk of substantial harm. Our de novo review of the record convinces us that, viewed in the light most favorable to the Commonwealth, the Commonwealth presented sufficient evidence that Garrett was gravely ill in the weeks preceding his death and that the Tuckers' failure to take him to a medical professional put him at risk that substantial harm would result. Garrett, a ten month old infant, exhibited symptoms of a persistent cough, noisy, raspy breathing, a fluctuating fever that occasionally exceeded 102 degrees, dehydration, loss of appetite, lethargy, and congestion that lasted for at least two weeks. Despite these symptoms, the Tuckers failed to seek medical attention.

Instead, the Tuckers treated Garrett by alternating ibuprofen and Tylenol, hydrating Garrett with a syringe to put drops into his mouth, administering albuterol with a nebulizer, and providing extra liquids when Garrett could consume them. Although Cassandra stated that she contacted DCF to arrange for a social worker to take Garrett to the doctor, no evidence was located to corroborate that Garrett was seen by a doctor in February or that Cassandra contacted DCF. Helen stated that she never took Garrett to the doctor in February.

The Tuckers were aware that Garrett required medical attention -- they joked that they should take one of their children to the doctor and bring Garrett along as an extra child to be examined. The grand jury also could infer that the Tuckers had the ability to recognize when to seek medical care but decided to forgo such care in Garrett's case. When Jessica became ill with symptoms less severe than Garrett's, the Tuckers contacted her doctor for treatment advice but did not do the same for Garrett despite knowing that he had a pediatrician in Berkshire county. Additionally, Tracy commented to Cassandra that Garrett should be seen by a doctor. Due to their foster parent training, the Tuckers were aware that they could seek emergency medical treatment, as needed.

Last, the surveillance video footage of the children's bedroom supports probable cause to believe that the defendants

were wanton or reckless in their failure to seek medical attention. In the video, Garrett's pronounced breathing is notable. Kumar testified that the sound of the persistent nonstop coughing was "air hunger" as Garrett struggled to breathe. The footage from the camera showed that Matthew walked by Garrett's crib, put another child to bed, and walked back out of the room without checking on him. From this alone, a grand jury could conclude that a reasonable person in Matthew's position would have understood the high degree of risk and responded to Garrett's gasping breath by seeking immediate medical care. The jury could infer, and Kumar testified, that Garrett exhibited this symptom for a period of time preceding the video footage and that the Tuckers were aware of the sound. The grand jury were permitted to discredit the Tuckers' statement that Garrett improved that day. Additionally, Cassandra's statements that she put Garrett to bed and saw him moving at around 3 A.M. were contradicted by the surveillance footage showing that Garrett had stopped moving at around 7:34 P.M. after Adam had put him in his crib at around 6:30 P.M. The grand jury heard sufficient evidence to support probable cause for the indictment. See Commonwealth v. Riley, 73 Mass. App. Ct. 721, 727 (2009) ("The weight and credibility of the evidence is wholly for the grand jury").

This determination is supported by our case law. In Commonwealth v. Twitchell, 416 Mass. 114, 116 (1993), we recognized that a parent may be convicted of involuntary manslaughter as a result of a wanton or reckless failure to seek medical attention for a child in the parent's care. In so holding, we relied on Commonwealth v. Gallison, 383 Mass. 659, 665 (1981), where a conviction of manslaughter was upheld after a parent made no effort to obtain medical help despite knowing that her child was gravely ill, and the evidence supported the determination that the parent's omission constituted a failure to meet her duty to provide for the care and welfare of her child.

The Tuckers do not argue that they did not owe Garrett a duty of care. Rather, they argue that the evidence presented to the grand jury was insufficient to show that the Tuckers or other parents in their position would have been aware that caring for a child at home created a high likelihood that grave danger would result. However, Kumar testified that a lay person could see that the nonstop persistent cough was a sign of respiratory distress that was not normal breathing. For the reasons stated above, the evidence provided probable cause to believe that the Tuckers knew or reasonably should have known that Garrett required immediate medical attention.

"To constitute wanton or reckless conduct, as distinguished from mere negligence, grave danger to others must have been apparent, and the defendant must have chosen to run the risk rather than alter his [or her] conduct so as to avoid the act or omission which caused the harm." Welansky, 316 Mass. at 398. However, "[w]hether certain behavior is properly categorized as reckless or negligent is ordinarily left for the jury." Levesque, 436 Mass. at 452. Where, as here, the grand jury returned indictments against the defendants and there was sufficient evidence to support those indictments, we decline to substitute our judgment for the grand jury's. That is not to say that the evidence will be sufficient to support guilty verdicts at trial. See Commonwealth v. Flynn, 420 Mass. 810, 815 (1995); Commonwealth v. Michaud, 389 Mass. 491, 498-499 (1983). Rather, we conclude only that, in the unique circumstances of these cases, when viewed in the light most favorable to the Commonwealth, the grand jury were presented with sufficient evidence to support indictments for involuntary manslaughter.

ii. Reckless endangerment of a child. A product of the Legislature, reckless endangerment of a child requires the Commonwealth to prove that the child under the age eighteen suffered a substantial risk of serious bodily injury and that the defendant wantonly or recklessly (i) engaged in conduct that

created the substantial risk or (ii) "failed to take reasonable steps to alleviate that risk where a duty to act exists." Commonwealth v. Coggeshall, 473 Mass. 665, 667-668 (2016). Unlike involuntary manslaughter, which requires the Commonwealth to prove that either the defendant or a reasonable person in the same circumstances would have realized the gravity of the danger, reckless endangerment of a child requires that the defendant actually be aware of the risk. Hardy, 482 Mass. at 421-422. Because we conclude that the Commonwealth presented sufficient evidence for probable cause to believe that the Tuckers were aware that their conduct created a substantial risk of harm and, therefore, to support indictments for involuntary manslaughter, the evidence also was sufficient to support indictments for reckless endangerment of a child. See id. at 422.

b. Grand jury impairment. In addition to finding insufficient evidence to support the alleged offenses, the motion judge dismissed the indictments because he concluded that the Commonwealth improperly introduced evidence of DCF overpayments, financial remunerations, and Cassandra's blog posts with no purpose other than to portray the Tuckers in a negative light. On appeal, the Commonwealth asserts that the dismissal constitutes reversible error because the financial information and blog posts were relevant, were not untruthful or

misleading, and did not impair the integrity of the jury, as the prosecutor provided limiting instructions.  The Commonwealth argues that the motion judge erred by ignoring the established standard for grand jury impairment as outlined in O'Dell, 392 Mass. at 446-447, and Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986).

Matthew filed a pretrial motion to dismiss the indictments on grounds that the integrity of the grand jury proceedings was impaired by the Commonwealth's presentation of "irrelevant" DCF financial records and blogs posts written by Cassandra. Cassandra's pretrial motion to dismiss was confined to the sufficiency argument.  On appeal, Matthew raises one argument that was not raised below, and Cassandra raises multiple arguments that were not made in the Superior Court.  Because their arguments differ from those made before the motion judge and each other, we address Matthew's and Cassandra's arguments separately.

An indictment may be dismissed when "the integrity of the grand jury proceeding was impaired by an unfair and misleading presentation to the grand jury."  O'Dell, 392 Mass. at 446-447. "To demonstrate that such impairment occurred, a defendant must establish that (1) the evidence was presented knowingly or with reckless disregard for its truth; (2) the evidence was presented with the purpose of obtaining an indictment; and (3) the

improper evidence probably influenced the grand jury's decision to indict." Commonwealth v. Brown, 490 Mass. 171, 181 (2022), citing Mayfield, 398 Mass. at 621. "Reckless disregard of the truth leading to the presentation of false or deceptive evidence could also warrant dismissal of an indictment" (citation omitted). Brown, supra at 182, quoting Mayfield, supra.

i. Matthew's arguments. On the last day of the grand jury presentation, the Commonwealth presented evidence that DCF overpaid the Tuckers for Garrett's placement, that the Tuckers reimbursed DCF, and that the Tuckers received payments for Garrett and other adopted children in their care.

The Commonwealth argued that the evidence was relevant to establish that the Tuckers possessed a duty of care to Garrett. Our review of the record establishes that Matthew has not demonstrated that the integrity of the grand jury was impaired by the evidence.

Under Mayfield, Matthew was required to demonstrate that the evidence was presented knowingly or with reckless disregard for its truth, for the purpose of obtaining an indictment, and probably influenced the jury. Here, the financial records were not false, as they accurately portrayed the financial history between the Tuckers and DCF. Nor were they introduced recklessly. Cf. Brown, 490 Mass. at 184. As a whole, the

financial information was relevant to establish that the Tuckers possessed a duty of care to Garrett.

However, information regarding the overpayments that the Tuckers received and information that the Tuckers were required to reimburse DCF could demonstrate improper prior bad act or character evidence. Assuming, without deciding, that the overpayment information was improper, the brief mention of the overpayment does not rise to the level of "recklessness" to satisfy the first prong of Mayfield. For example, in Brown, the first prong was satisfied where the prosecutor introduced a "voluminous" number of the defendant's and a possible accomplice's Department of Correction records that demonstrated prior bad acts, proclivity to violence, and other general bad character of both defendants. Brown, 490 Mass. at 182-184. There, we agreed with the motion judge that the prosecutor "was reckless in introducing such improper, unfairly prejudicial, and irrelevant evidence to the grand jury in order to obtain an indictment" without first weighing the fairness of the offering. Id. at 184. Here, the momentary mention of the overpayments does not equate to the "voluminous" number of records introduced in Brown, and thus does not constitute recklessness under the first prong of Mayfield. Therefore, the integrity of the grand jury was not impaired by the introduction of the financial records.

Similarly, the Commonwealth's introduction of blog posts does not satisfy the "heavy burden" that the defendants must demonstrate to establish impairment of the grand jury proceeding.  See Commonwealth v. Fernandes, 483 Mass. 1, 7 (2019).  After the presentation of the financial records, the Commonwealth presented six blog posts that were read to the grand jury; further, the Commonwealth provided the entire blog as an exhibit to use in the grand jury's deliberation.  The blog posts detailed Cassandra's frustrations and experiences as a foster parent and, in the portion read to the grand jury, exhibited her experience with the MassHealth system, obtaining medical care for foster children, and dealing with a noncommunicative sick child who had serious unknown medical conditions.  Again, under Mayfield, Matthew is unable to establish that the posts were presented falsely or recklessly, or that they likely influenced the grand jury's decision.  The posts were relevant to Cassandra's knowledge as a foster parent and described her experiences with the foster care system and medical providers.  Although an argument could be made that the posts, written two years before Garrett arrived in the home, were too remote in time to be relevant, at the grand jury stage the rules of evidence are less stringent than at trial.  See Commonwealth v. Kater, 432 Mass. 404, 412 (2000).  Even assuming, without deciding, that the introduction of the

entirety of the blog was improper, Matthew cannot show that the evidence had an impact on the grand jury's determination.

As the Commonwealth noted, by this time in the presentation, the grand jury had reviewed the powerful video footage of Garrett in his crib, had heard testimony from two medical experts, and had posed thoughtful questions to the witnesses about Garrett's illness and ability to breath. As there was substantial other evidence of probable cause, the arguably improper evidence probably did not influence the grand jury's decision to indict. See Commonwealth v. Hall, 485 Mass. 145, 160 (2020); Commonwealth v. Vinnie, 428 Mass. 161, 175, cert. denied, 525 U.S. 1007 (1998).

Matthew argues that the presentation to the grand jury of the financial records and the blog posts, in contrast to the inclusion of interviews with DCF social workers referring to the Tuckers in a positive light only as exhibits on disc not specifically played for the grand jury, created a negative portrayal of the Tuckers. Similarly, in stating that the Commonwealth presented "one-sided" testimony by failing to highlight the positive statements of a social worker complimenting the Tuckers and the social worker's statement that the blog posts had "nothing to do with kids," the motion judge classified the evidence as "exculpatory." However, this evidence was not "exculpatory," as it did not contradict the

evidence presented by the Commonwealth and thus was not material evidence that the Commonwealth was required to highlight. The statements consisted only of information that was not a required element of the offenses charged. Cf. Commonwealth v. Washington W., 462 Mass. 204, 212-213 (2012) (evidence withheld from grand jury regarding necessary element of charged offense tainted integrity of grand jury proceedings, as evidence was material to question of probable cause for required element and likely influenced grand jury's decision to indict).

For the first time on appeal, Matthew raises a concern regarding the impropriety of a statement made by Sergeant Ryan Dickinson, the lead investigator on the case, that the motion judge did not address in his decision. Because this alleged flaw was not "seasonably asserted" at the trial court level, it is waived, and we review to determine whether there was error and, if so, whether a substantial risk of a miscarriage of justice resulted. See Mayfield, 398 Mass. at 622 n.4; Commonwealth v. Gant, 51 Mass. App. Ct. 314, 320-321 (2001). "A substantial risk of a miscarriage of justice exists when we have a serious doubt whether the result . . . might have been different had the error not been made" (quotation and citation omitted). Commonwealth v. Curran, 488 Mass. 792, 794 (2021).

Sergeant Dickinson testified that, when interviewed, the Tuckers' eldest daughter, Darlene, stated that Garrett "had a

slight cough" and was "struggling to breath."  However, examination of the interview indicates that Darlene told police that Garrett was getting better and was "coughing a little bit and that's really what he was doing.  He was having a little trouble breathing."[8]  The Commonwealth did not correct Dickinson's statement.  The Commonwealth also omitted Darlene's statement that Garrett "seemed fine, and pretty cheerful."

Arguably, this is a slight mischaracterization of Darlene's statements and could satisfy the first two prongs of Mayfield; however, this is a minor misstep in the context of overwhelming evidence concerning Garrett's condition, including the video of him struggling to breathe and then stopping and remaining still for hours.  See Brown, 490 Mass. at 184-186 (Commonwealth's introduction of "inflammatory" evidence without responsibly weighing its fairness satisfied reckless behavior prong but did not require vacation of indictments where grand jury were presented with sufficient evidence to establish probable cause). Cf. O'Dell, 392 Mass. at 449 (distortion of defendant's statements by omitting key portions of statement impaired grand jury's understanding of facts, thereby impairing grand jury's integrity).  Notwithstanding this possible impropriety, and that

---

[8] The Commonwealth did not play the interview for the grand jury, but provided the videos as an exhibit that the grand jury could review at their discretion.

a grand juror commented on the daughter's ability to recognize Garrett's health issue where Matthew seemingly could not, for the reasons stated above, when viewed in the context of the entire proceeding, the evidence probably did not influence the grand jury's decision to indict. Therefore, we discern no substantial risk of a miscarriage of justice. See Vinnie, 428 Mass. at 175.

ii. Cassandra's arguments. For the first time on appeal, Cassandra raises a litany of errors that, she alleges, the Commonwealth committed in its presentation of evidence to the grand jury. In addition to the arguments raised by Matthew -- namely, the prejudicial impact of the financial records, the blog posts, Darlene's statement, and the failure to highlight positive statements from the social workers -- Cassandra asserts error in the Commonwealth's statement that DCF took "disciplinary action" against the Tuckers because of the blog, the presentation of the missed December 18 doctor's appointment, and the Commonwealth's failure to correct a witness's testimony about the medical condition of the Tuckers' youngest daughter. The combination of these errors, she argues, requires an affirmance of the dismissal of the indictments. Again, because these alleged flaws were not raised at the trial court level, they are waived, and we review to determine whether there was error and, if so, whether a substantial risk of a miscarriage of

justice resulted.[9]  See Mayfield, 398 Mass. at 622 n.4; Gant, 51 Mass. App. Ct. at 320-321.

We begin with Cassandra's argument that the "disciplinary action" statement presented by the Commonwealth was false.  See Mayfield, 398 Mass. at 621-622.  The prosecutor asked Sergeant Dickinson, "So, was there a point in time where [DCF] took disciplinary action against the Tuckers during their tenure as foster parents?"  The sergeant replied in the affirmative, and the prosecutor asked, "And what was the reason for this discipline?"  The witness then discussed the blog posts.  Cassandra argues that the Commonwealth was aware that DCF did not take disciplinary action against the Tuckers, and thus presented false questions and testimony to the grand jury.  See Commonwealth v. Salman, 387 Mass. 160, 161, 167 (1982).  However, upon review of the transcript, the prosecutor expanded on the "action" taken by DCF.  She asked, "So, Ms. Barlow-Tucker did stop posting her blog after DCF raised their concerns with her, correct?"  The witness replied, "I believe so."  Contrary to Cassandra's arguments, the Commonwealth represented that the action taken by DCF was to engage in a conversation about the

_____

[9] For the reasons we set forth rejecting Matthew's arguments, Cassandra's arguments about the impact of the financial records, the blog posts, Darlene's statement, and the failure to highlight positive statements from the social workers, when viewed in the context of the entire proceeding, probably did not influence the grand jury's decision to indict.

appropriateness of the blog posts.  There was no attempt to mislead the grand jury and thus no error.  See Commonwealth v. Jewett, 442 Mass. 356, 364-365 (2004).

Next, Cassandra asserts that the Commonwealth's presentation of the DCF policy and Garrett's missed December 18 follow-up appointment, along with the Commonwealth's failure to highlight her December 20 e-mail message to DCF checking on the status of the December 18 appointment, created a false and misleading impression that she could not be bothered to take Garrett to the doctor, which prejudiced her.  She maintains that the Commonwealth misled the grand jury by focusing on portions of the Model Approach to Partnership in Parenting manual that stated the foster family agreed to schedule and keep any follow-up appointments, despite the Commonwealth's knowledge that the arrangement of who would take the child to the appointments was an appointment-by-appointment or case-by-case basis.  We disagree.  The portion of the manual read to the grand jury stated that DCF delegated the authority to the foster parent to arrange medical care on the child's behalf.  It did not state that it was the foster parents' sole responsibility to arrange the medical care.  In fact, the grand jury heard testimony indicating the opposite.  The grand jury heard that the social worker, Helen, took Garrett to his December 10 appointment and knew about the December 18 follow-up appointment.

Although the Commonwealth did not present live testimony about Cassandra's follow-up e-mail message to DCF regarding the missing appointment, the Commonwealth did present discs containing the information for the grand jury to review. Further, through the recorded police interview, the grand jury heard Cassandra's statements that the responsibility for taking the children to the doctor's appointments depended on the social worker, which was corroborated by Dickinson's and Kumar's statements that a social worker took Garrett to his December 10 appointment -- which was after Garrett began residing with the Tuckers on December 5. Moreover, the issue presented in these cases was not whether the Tuckers provided follow-up medical care. The issue was whether they provided medical care after they became aware that he had a serious illness. By all accounts, in December 2019, Garrett was relatively healthy. It was not until late January or early February 2020 that he became seriously ill and, as the Commonwealth argues, required medical attention to address his ailments. That the Commonwealth did not highlight the December 20 e-mail message for a routine appointment was neither false nor misleading.

Last, Cassandra asserts that the Commonwealth's failure to correct a witness's testimony about the medical condition of the Tuckers' youngest daughter, Jessica, was prejudicial. On the last day of testimony, a grand juror asked the witness, a speech

pathologist, whether the daughter had a certain medical condition.  The medical condition that the juror mentioned was not the accurate condition that the daughter had.  Nonetheless, the witness replied, "Yes.  I mean, she has a lot of complex medical."  The juror prodded, "And that's a respiratory issue, right," to which the witness responded, "I don't think, yeah." The juror inquired later, "So that one could assume that the foster parents would have some understanding of a respiratory ailment, toward like the sound of one?"  The prosecutor gave an instruction that the witness provide only an answer from her personal knowledge or medical expertise as a speech pathologist. The witness responded, "Yeah.  So, I wouldn't know."  The Commonwealth did not correct the misimpression regarding the daughter's medical condition.

"Evidence submitted in response to a question by a grand juror . . . is less problematic than evidence submitted 'by the prosecutor's design.'"  Brown, 490 Mass. at 185, quoting Vinnie, 428 Mass. at 174-175.  The grand juror's statements about the medical condition, and the witness's response, were inaccurate. Thus, arguably, the first prong of Mayfield, i.e., that false evidence was presented to the grand jury, was met.  See Mayfield, 398 Mass. at 621.

However, Cassandra is unable to meet the remaining two prongs -- that the evidence was presented for the purpose of an

indictment and probably influenced the jury. "The record is devoid of evidence that the . . . [witness's] responses . . . were presented to the grand jury in bad faith. Nor do we find any evidence that the factual discrepancies were knowing or purposeful." Commonwealth v. Mathews, 450 Mass. 858, 876 (2008). It appeared that the witness, a speech pathologist, confused one ailment with another. When the prosecutor realized that the witness's responses to the juror's questions may have been at the brink of the witness's personal knowledge or professional expertise, the prosecutor provided a limiting instruction, after which the witness stated that she did not know the answer to the juror's question. The evidence was not presented for the purpose of an indictment, nor did it probably influence the jury. Additionally, given the evidence presented against the Tuckers, the statement probably did not have an impact on the grand jury's decision to indict, and thus did not create a substantial risk of a miscarriage of justice. Therefore, Cassandra has failed to show that the Commonwealth's alleged misconduct created a substantial risk of a miscarriage of justice. See id.

3. Conclusion. Based on the foregoing, we reverse the order allowing the defendants' motions to dismiss. We remand the cases to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.